UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FIVE STAR BANK

*Plaintiff*,

v.

KATHERINE MOTT; ROBERT HARRIS;
KRM EVENTS, LLC; KATHERINE'S ON MONROE,
LLC; THE DIVINITY ESTATE AND CHAPEL, LLC;
KNC ELEGANCE, LLC d/b/a
THE WINTERGARDEN BY MONROES; 11
WEXFORD GLEN, LLC; RCC MONROES LLC; NAF
REMODELING LLC; MONROES AT RIDGEMONT
LLC; CRESCENT BEACH AT THE LAKE LLC; and
MOTT MANAGEMENT LLC

*Defendants*.

Case # 6:24-CV-6153-FPG

DECISION AND ORDER

## INTRODUCTION

On March 11, 2023, Plaintiff, Five Star Bank (sometimes, "FSB"), filed the present complaint ("Complaint") against defendants KRM Events, LLC; Katherine's on Monroe, LLC; The Divinity Estate and Chapel, LLC; KNC Elegance, LLC d/b/a The Wintergarden by Monroes; 11 Wexford Glen, LLC; RCC Monroes LLC; NAF Remodeling LLC; Monroes at Ridgemont LLC; Crescent Beach at the Lake LLC; Mott Management LLC (collectively, the "Entity Defendants"), and Katherine Mott and Robert Harris, in their individual capacities and as the controlling members of certain of the Entity Defendants (collectively, "Defendants"). ECF No. 1. Plaintiff alleges that Defendants engaged in an elaborate check-kiting scheme resulting in the loss of more than $18 million to Plaintiff. *Id*. Plaintiff brings claims of indemnification, debt collection, fraud, breach of contract, and a violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act. *Id*.

Presently before this Court is Plaintiff's motion to appoint a receiver "to manage the ongoing operations of the Defendant Entities, investigate, and oversee their financial affairs and

1

make whole any and all parties aggrieved by the Defendants['] fraudulent scheme." ECF No. 1 ¶ 4. Defendants object to this Court's jurisdiction over the case. ECF No. 25.[1] Following an expedited briefing schedule, the Court heard oral argument on Plaintiff's motion on Tuesday April 3, 2024. The Court finds that (i) it has jurisdiction over this case and (ii) the appointment of a receiver is necessary to prevent harm to Plaintiff. Accordingly, Plaintiff's motion to appoint a receiver is GRANTED.

**BACKGROUND**[2]

Each Entity Defendant is a New York Limited Liability Company managed, operated and controlled by Defendant Mott. ECF No. 1 ¶ 8-17. Robert Harris is alleged to co-manage and operate KRM Events, LLC. *Id.* ¶ 8. On November 29, 2022, Mott opened individual business demand deposit accounts at FSB in the names of each of the following Entity Defendants: KRM Events, LLC; Katherine's on Monroe, LLC; The Divinity Estate and Chapel, LLC; and KNC Elegance, LLC. *Id.* ¶ 24-28. Mott opened two separate accounts in the name of KRM Events, LLC. *Id.* ¶ 24-25. Both Mott and Harris are signatories on one of those accounts. *Id.* ¶ 24. Mott is the authorized signatory for each of the other FSB accounts. *Id.* ¶ 24-28.

Plaintiff alleges that on December 15, 2022, Defendant Mott began a practice of rapidly moving funds between FSB and other financial institutions by check transfer to create the false perception that funds were available when they were not. ECF No. 31 ¶ 9. A bank-directed investigation into the accounts revealed that Defendants engaged in this rapid check-kiting transfer

---

[1] Although Defendants Mott and Harris filed two separate memoranda in opposition to Plaintiff's motion to appoint a receiver, Defendant Harris' memorandum incorporates the entirety of the arguments in Defendant Mott's memorandum by express reference. ECF No. 26. The Entity Defendants have not filed a specific opposition.

[2] The facts in this section are taken from Plaintiff's Complaint (ECF No. 1), Plaintiff's Reply declaration (ECF No. 31), and Plaintiff's Civil RICO Case Statement (ECF No. 32). Although Defendants' opposition responded only to the Complaint, Defendants had the opportunity to respond to the additional facts alleged in reply at oral argument but declined to do so.

several times over the course of the banking relationship, including at least on February 21, 2023, May 18, 2023, September 7, 2023, and January 4, 2024. *Id.* ¶ 11. In February 2024, Defendants' fraudulent check scheme quickly accelerated, causing dramatic losses to Plaintiff's business. *Id.* ¶ 12.

Specifically, on February 22, 2024, Defendant Mott deposited 42 checks, totaling $20,922,000, drawn on accounts held at FSB ("FSB Checks") into an account held at Kinecta Federal Credit Union ("Kinecta FCU," the account "Kinecta I"). *Id.* ¶ 13. This transaction was processed at Kinecta FCU on February 22, 2024 and the funds were pulled from FSB via the Federal Reserve check-clearing process on February 23, 2024. *Id.* On February 23, 2024, Defendant Mott wrote 21 checks in the amount of $20,907,000, drawn on another account purported to be held at Kinecta FCU (the account, "Kinecta II," the checks "Kinecta Checks"). *Id.* ¶ 14. However, Kinecta II was closed as of February 19, 2024 and Defendant Mott had express notice of its closure. ECF No. 31-1 ¶3. The Kinecta Checks were deposited at FSB on February 23, 2024 and the funds were made available in the FSB accounts to Defendant Mott that evening during the end of day processing and were ultimately drawn on to fund the FSB Checks deposited in Kinecta I on February 22, 2024—money that was already withdrawn from FSB. ECF No. 31 ¶ 14.

The Kinecta Checks deposited on February 23, 2024, were charged back to FSB by Kinecta FCU, but because Defendant Mott wrote a second and third round of Kinecta Checks for the same amount of money, and on each occasion drawn on the closed Kinecta II account for several days, the accounts at FSB did not have a negative balance until the final round of Kinecta Checks were charged back on March 5, 2024, at which point the FSB accounts were overdrawn by approximately $20.7 million. *Id.* ¶¶ 15-18; ECF No. 1 ¶ 37. Plaintiff offset some of those losses

with other funds held by Mott at FSB, leaving the accounts overdrawn by approximately $18.9 million. ECF No. 1 ¶ 38. As of March 29, 2024, the accounts continue to be overdrawn by approximately $18.9 million. ECF No. 31-2 at 2; ECF No. 31¶ 23.

In addition to the foregoing allegations, Plaintiff alleges that Defendants' check-kiting habits predate and extend beyond the scope of the parties' relationship. Specifically, Defendants maintained accounts at Evans Bank and Lyons National Bank that were closed due to suspected check-kiting. ECF No. 31 ¶ 20(a), (f). Plaintiff further alleges that Defendants' bank fraud is actively ongoing by utilizing accounts at other banks and non-bank financial services providers, such as Community Bank and Alliance Payroll, her payroll services provider. ECF No. 31-2 at 5; ECF No. 31 ¶¶ 20(g), 21. Plaintiff alleges that this ongoing activity is intended to dissipate and conceal the money obtained from FSB via the previously described check-kiting scheme. ECF No. 31 ¶ 21.

## DISCUSSION

Defendants oppose the appointment of a receiver by arguing that this Court lacks jurisdiction to grant the relief requested. In the alternative, Defendants assert that the appointment of a receiver is inappropriate because Plaintiff seeks legal remedies. The Court is unmoved by either argument. The Court will first address the question of federal jurisdiction and then discuss its assessment of the need to appoint a receiver.

### I. Jurisdiction

Defendants oppose the appointment of a receiver by contesting this Court's federal subject matter jurisdiction over the case. ECF No. 25 at 4. Defendants argue that Plaintiff fails to adequately plead a pattern of racketeering activity, and because of such failure, "has failed to plead a plausible RICO claim." *Id.* According to Defendants, because Plaintiff is without a plausible

RICO claim and the RICO claim is the only basis for federal subject matter jurisdiction, this Court lacks subject matter jurisdiction over the entire case. *Id.* at 5.

Defendants are correct to insist that this Court have subject matter jurisdiction before appointing a receiver. "As with any order of the court, an order appointing a receiver is a remedy for which the court requires subject-matter jurisdiction" either "upon the existence of general federal question or diversity ... jurisdiction or some other specific statutory jurisdictional base." *Connecticut Hous. Fin. Auth. v. Eno Farms Ltd. Partnership*, No. 3:07CV319, 2007 WL 1670130, at *5 (D. Conn. June 6, 2007). However, Defendants' argument that this Court lacks subject matter jurisdiction relies on a misapprehension of "the distinction between two sometimes confused or conflated concepts: federal-court 'subject-matter' jurisdiction over a controversy; and the essential ingredients of a federal claim for relief." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 503 (2006).

The Supreme Court has observed that the word "jurisdiction . . . is a word of many, too many, meanings." *Arbaugh*, 546 U.S. at 510 (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 90 (1998)). Moreover, the Second Circuit has observed that judicial opinions "often obscure the issue by stating that the court is dismissing 'for lack of jurisdiction' when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim." *Da Silva v. Kinsho Intern. Corp.*, 229 F.3d 358, 361 (2000). These "unrefined . . . drive-by jurisdictional rulings [] should be accorded no precedential effect on the question whether the federal court had authority to adjudicate the claim in suit." *Arbaugh*, 546 U.S. at 511.

Defendants' argument essentially urges this Court to rule on the threshold issue of whether Plaintiff has sufficiently alleged a pattern of racketeering activity. This issue goes to the merits of Plaintiff's claim, not jurisdiction. The irony of Defendants' contention is that "the court must

assume jurisdiction [in order] to decide whether the allegations state a cause of action" under RICO. *Bell v. Hood*, 327 U.S. 678, 682 (1946). However, once jurisdiction is properly assumed to resolve the question Defendants raise with respect to the sufficiency of Plaintiff's racketeering allegations, jurisdiction cannot then be "defeated as [defendants] seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Id.*

To the contrary, federal district courts have original subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Federal question jurisdiction under section 1331 is properly invoked when a plaintiff meets the minimum standard of pleading a colorable claim "arising under" the Constitution or laws of the United States. *See Bell*, 327 U.S. at 681-85. A plaintiff will fail to meet this standard where the claim is "'essentially fictitious,' 'wholly insubstantial,' 'obviously frivolous,' and 'obviously without merit[.]'" *Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 126 (2d Cir. 2016) (quoting *Shapiro v. McManus*, 577 U.S. 39, 45-46 (2015)). Unless a claim fails to clear even that low bar, the Supreme Court has explained, that "the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." *Id.* (quotations omitted).

Plaintiff's Complaint pleads a colorable claim arising under the laws of the United States. Plaintiff's basis for federal question jurisdiction is the RICO Act, which grants a civil right of action in federal district court to "any person injured in [their] business or property by reason of a violation of [18 U.S.C. §] 1962." 18 U.S.C. § 1964(c). A colorable RICO claim requires alleging (a) a violation of 18 U.S.C. § 1962, (b) injury to Plaintiff's property or business, and (c) causation of the injury by the violation. *See Sky Medical Supply Inc. v. SCS Support Claims Service Inc.*, 17 F. Supp. 3d 207 (E.D.N.Y. 2014). To state a violation of 18 U.S.C § 1962, a plaintiff must allege

"(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains [an] interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123-24 (2d Cir. 2018).

Plaintiff pleads that it suffered the loss of more than $18 million in its banking business. ECF No. 1 ¶ 1. Plaintiff substantiates this allegation by identifying the accounts held with it in the names of the Entity Defendants that are collectively overdrawn in that amount. *Id.* ¶ 39. This constitutes a colorable allegation of injury.

Plaintiff alleges that this injury was the direct result of Defendants writing checks for amounts that exceeded amounts available in the accounts from which they were drawn, and depositing those checks into accounts held by Plaintiff. Plaintiff then alleges that Defendants withdrew money from the accounts held with it before the deposited checks were dishonored for insufficient funds, which caused the accounts held with Plaintiff to be overdrawn by the excessive amounts. *Id.* ¶ 30-38. This is a colorable allegation of causation.

Plaintiff pleads that the bad checks and ACH transactions initiated by Defendants constitute "fraudulent financial transactions" in violation of 18 U.S.C. § 1344. A violation of section 1344 constitutes a "racketeering activity" as defined in 18 U.S.C. § 1961. ECF No. 1 ¶ 52. Therefore, Plaintiff has made a colorable allegation of a violation of section 1962.

To meet the bare minimum standard of alleging a pattern of racketeering activity, Plaintiff need only allege two instances of the fraudulent financial transactions, but Plaintiff alleges that Defendant executed 63 fraudulent financial transactions in rapid succession. 18 U.S.C. § 1961(5); ECF No. 1 ¶ 34. Plaintiff substantiates this claim with copies of the 63 checks that were signed by Defendant Mott as an exhibit to its motion to appoint a receiver. ECF No. 3-4. Plaintiff also alleges

that Defendants engaged in similar check-kiting schemes on several prior occasions over a time period that extends more than a year before the filing of this lawsuit. ECF No. 31 ¶¶ 9-11.  Further, Plaintiff alleges that Defendants engaged in check-kiting at other banking institutions prior to forming a relationship at FSB and that Defendants attempts to hide and steal money are ongoing with other institutions. This is a colorable allegation of two or more acts constituting a pattern of racketeering activity.

Defendants argue that Plaintiff fails to sufficiently allege a pattern of racketeering activity. Specifically, Defendants argue that Plaintiff's allegations of (i) the 63 alleged instances of racketeering activity together with the past activity over the course of at least a year and (ii) the allegations of ongoing activity are not sufficient to allege "a threat of continued criminal activity." ECF No. 25 at 6 (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999). In support of this argument, Defendants assert that the relationship between Defendants and FSB has ended, ECF No. 25 at 8, and rely on *de La Roche v. Calcagnini*, where the court stated that the "[plaintiff] cannot claim open-ended continuity; once his business relationship with [defendant] ended, the fraud necessarily ended as well." No. 95 CIV. 6322, 1997 WL 292108, at *10 (S.D.N.Y. June 3, 1997).

Defendants' reliance on *de La Roche* is misplaced for two reasons.  First, at oral argument, Plaintiff disputed the characterization of the relationship between FSB and Defendants as one that has terminated because the deposit account agreement between them endures with ongoing obligations. Second, and more importantly, this factual dispute is irrelevant under the circumstances of the facts alleged here. Plaintiff merely needs to show "some evidence from which it may be *inferred* that the predicate acts were the regular way of operating that business, or that *the nature of the predicate acts* themselves implies a threat of continued criminal activity." *Spool*

*v. World Child Intern. Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (emphasis added). In *de la Roche*, the plaintiff was the defendant's only alleged victim, and therefore, the nature of the predicate act required the relationship to continue for the fraud to continue. *See de la Roche*, 1997 WL 292108, at *10. Here, Plaintiff has not alleged that FSB is Defendants' only victim, rather, FSB is one among many banks who have closed Defendants accounts due to check-kiting, or the suspicion thereof. Ultimately, at a later stage of this litigation, Plaintiff will only need to offer "some evidence from which it may be *inferred*. . . [that] a threat of continued criminal activity" exists. *Spool*, 520 F.3d at 185 (emphasis added). Only an inference is required, and Plaintiff has offered substantive allegations of suspected check-kiting at other banking institutions pre-dating the relationship with FSB, which suggests that Plaintiff might be able to produce such evidence from which an inference may be drawn.

Plaintiff alleges that these bad checks were written on behalf of business entities controlled and owned by Defendants, which satisfies the bare minimum definition of "enterprise" under 18 U.S.C. § 1961(4). Together this amounts to a colorable allegation of a direct investment by Defendants in an enterprise, whose activities affect interstate commerce.

Plaintiff has substantiated its claims with specific allegations and documentation of the essential events constituting the core of its claims—the fraudulent financial transactions—placing its claims far from the realm of fictitious, frivolous, and insubstantial. *See Gallego*, 814 F.3d at 126. Thus, Plaintiff's claims meet the very low bar of alleging a colorable claim that invokes federal question jurisdiction.

Although Defendants raise myriad arguments regarding the sufficiency of the pattern of racketeering allegations in Plaintiff's complaint—specifically, whether those allegations are sufficient to establish the open-ended continuity requirement—those arguments go to the merits

of Plaintiff's claim and are more appropriately argued in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The Court expressly reserves judgment on the merits of such arguments at this stage. The appointment of a receiver is *preliminary* to a resolution on the merits and is intended to maintain the status quo to prevent further harm to Plaintiff while these thorny issues on the merits are considered and resolved. As such, Defendants cannot undermine the propriety of preliminary relief, nor slow it down, by forcing an argument on the merits disguised as a jurisdictional dispute. It is worth emphasizing that upon future resolution of the merits, whether in the affirmative or negative, no such resolution would defeat the jurisdiction that the Court hereby assumes today. *See Bell*, 327 U.S. at 682.

## II.    Appointment of Receiver

Plaintiff seeks the appointment of a receiver "to manage the ongoing operations of the Defendant Entities, investigate, and oversee their financial affairs and make whole any and all parties aggrieved by the Defendants fraudulent scheme." ECF No. 1 ¶ 4. Defendants do not contest or even acknowledge the factual allegations in Plaintiff's complaint and motion for preliminary relief. *See generally* ECF No. 25.

Federal Rule of Civil Procedure 66 "govern[s] an action in which the appointment of a receiver is sought." Fed. R. Civ. P. 66.  "The appointment of a receiver is considered to be an extraordinary remedy, and should be employed cautiously and granted only when clearly necessary to protect plaintiff's interests in the property." *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997). "[A] decision to appoint or not to appoint a receiver is committed to the sound discretion of the trial court." *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) ((citing *Rosen*, 106 F.3d at 34). The following factors are relevant to the Court's consideration of the need for a receivership: (1) fraudulent conduct on part of defendant, (2) imminent danger that property will be lost or

squandered, (3) inadequacy of available legal remedies, (4) probability that harm to plaintiff by denial of appointment would be greater than injury to parties opposing appointment, (5) plaintiff's probable success in action, (6) possibility of irreparable injury to their interests in property and (7) whether interests of plaintiff and others sought to be protected will in fact be served by receivership. *See New York v. Fin. Servs. Network*, 930 F. Supp. 865, 872 (W.D.N.Y. 1996).

Plaintiff argues that a receiver is necessary because (i) it has sufficiently alleged Defendants' fraudulent conduct, (ii) Defendants' excessively overdrawn accounts create an imminent danger that Plaintiff's property will not be returned, (iii) Defendants' accounts remain overdrawn which creates a probability of harm to Plaintiff without a receiver, and (iv) Plaintiff will likely succeed on the merits. ECF No. 3-5 at 4-5.

First, the evidence of fraud strongly militates in favor of appointing a receiver. *See generally Compass-Charlotte 1031, LLC v. Prime Cap. Ventures, LLC*, No. 1:24-CV-55, 2024 WL 260507 (N.D.N.Y. Jan. 24, 2024). Plaintiff alleges that starting in February 2024, Defendant deposited or caused to be deposited approximately 63 checks in an aggregate amount exceeding $62 million into various accounts held in the name of the Entity Defendants at FSB. ECF No. 1 ¶ 34. Specifically, Mott wrote several checks from a closed account held in the name of one of the Entity Defendants at Kinecta FCU. *Id.* ¶ 31. The check amounts exceeded the amount of funds available in the closed account at Kinecta FCU. *Id.* Once the checks from Kinecta FCU were deposited into an account at FSB, Mott withdrew those amounts from the FSB accounts. *Id.* ¶ 32. After Mott withdrew the funds, FSB reconciled the accounts and discovered that Kinecta FCU could not honor the full amount of the original checks deposited. *Id.* ¶ 32-33. Mott ultimately withdrew more than $20.4 million from the FSB accounts before the checks from Kinecta FCU were dishonored for insufficient funds. *Id.* ¶ 35.

11

As it currently stands, the location of the $18.9 million owed to Plaintiff is unknown. Whether that money was used among the businesses of the various Entity Defendants or diverted to privately-held accounts outside those businesses remains to be discovered. If that money remains within the businesses, but is being held in an account not at FSB, a receiver could trace those funds to identify where those funds are being held, if they still exist. Moreover, Defendants continue to operate businesses with future revenue streams. Absent identification of where the specific funds withdrawn from FSB are being held, those future revenue streams are likely the only sources available to satisfy the liabilities owed to Plaintiff. Appointing a receiver to perform an accounting, trace the withdrawn funds, and to protect those future revenue streams is necessary to ensure that Plaintiff has a means of recovery. Therefore, "plaintiff is being harmed because it is missing over $[18] million and the failure to appoint a receiver could result in that money never being returned if it still exists." *Compass-Charlotte 1031, LLC*, 2024 WL 260507, at *7.

In opposing the motion to appoint a receiver, Defendants do not allege any harm to balance against Plaintiff's harm, and no presumption of harm arises after appointment of a receiver because under New York and federal law receivers "owe a fiduciary duty to the owners of the property under the receiver's care." *Compass-Charlotte 1031, LLC*, 2024 WL 260507, at *7. To the extent Defendants may be concerned about the operations of its businesses, Plaintiff conceded at oral argument that it is willing to accept a receivership that is narrower in scope to permit the ongoing operations of the Entity Defendants' businesses.

Defendants' sole argument on the merits against appointing a receiver is the fact that Plaintiff seeks damages, which is a legal remedy. ECF No. 25 at 10. For this proposition, Defendants rely on *Zyppah, Inc. v. Ace Funding Source, LLC*. No. 1:19-CV-01158, 2019 WL 6647912, at *2 (S.D.N.Y. Nov. 6, 2019). In *Zyppah*, the plaintiffs alleged that the defendants

engaged in a pattern of fraudulent conduct in connection with merchant cash advance agreements. *Id.* at *1. The plaintiffs argued for the appointment of a receiver to ensure that the defendants did not engage in additional fraudulent conduct during the pendency of the litigation and to ensure that the defendants would be able to pay any judgment entered against them. *Id.* at *2. Nevertheless, the court denied plaintiffs' request to appoint a receiver because a legal remedy in the form of an award of damages was available. *See id.* (citing *Petersen v. Federated Dev. Co.*, 387 F. Supp. 355, 361 (S.D.N.Y. 1974) ("It would appear that should plaintiff prevail on his claims, he would have an adequate remedy in an award of damages against those who have allegedly defrauded him.")).

Although it is true that courts generally do not find harm where money damages would be an adequate remedy, "this rule does not inhere when any judgment ultimately obtained ... would be unenforceable." *Janvey v. Alguire*, No. 3:09-CV-724, 2010 WL 11619267, *7 (N.D. Tex. June 10, 2010) (citation omitted). For example, a "finding of irreparable harm may lie in connection with an action for money damages where the claim involves an obligation owed by an insolvent or a party on the brink of insolvency." *Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 340 (S.D.N.Y. 2020); s*ee also Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) (collecting cases) ("[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents."); *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010) (summary order) ("[W]e have held that a finding of irreparable harm may lie in connection with an action for money damages where the claim involves an obligation owed by an insolvent or a party on the brink of insolvency."). Indeed, recently in the Northern District, a court ordered the appointment of a receiver in a case where the defendants were alleged to have engaged in a pattern of fraudulent conduct resulting in the plaintiff's money disappearing. *See generally Compass-Charlotte 1031, LLC*, 2024 WL 260507.

Because the allegations sufficiently demonstrated that the defendants likely did not have enough money to pay their debts, the court found that it was appropriate to appoint a receiver to protect any money that might remain in the business from further fraudulent activity. *Id.* at *7.

Here, although, Plaintiff seeks money damages, Plaintiff has alleged sufficient facts to suggest that Defendant may be on the brink of insolvency. Plaintiff is able to have some insight into this since it is the bank that holds many of Defendants' business operating accounts. Altogether, Defendants have at least 30 business and personal accounts at FSB. Throughout the duration of Defendants' banking relationship with FSB, the total amount of funds held in all accounts never exceeded more than $7 million. ECF No. 31 ¶ 6. However, because of Defendants' alleged check-kiting, Defendants now appear to be overdrawn on their accounts by more than $18 million. Not only have Defendants failed to explain where the money is, they have not made payments on this debt and there is no evidence that Defendants ever had access to enough money to cover the amounts withdrawn. These allegations alone are sufficient to suggest that Defendants may be on the "brink of insolvency." *Alpha Cap.*, 432 F. Supp. 3d at 340. Thus, it is possible that a judgment in Plaintiff's favor would be inadequate.

Separately, on the facts alleged, Plaintiff could potentially also assert a property interest in money held by the Entity Defendants if it is traceable to the funds withdrawn from FSB on February 23, 2024. *See Metzner v. Quinnipiac Univ.*, 528 F. Supp. 3d 15, 37 (D. Conn. 2021) (explaining that where funds are "traceable to a plaintiff," the plaintiff can claim a "specific property interest" that would entitle it to "the right to possess [that] specific, identifiable money, rather than the right to the payment of money generally."). In this vein, should Plaintiff succeed, Plaintiff would not just be entitled to damages, but also those specific traceable funds that were stolen on February 23, 2024. A receiver could examine the books and records of the Entity

Defendants to determine if the funds are traceable and identifiable and where they might be held if they still exist.

Plaintiff brings claims under several theories of liability, including fraud, breach of contract and indemnification. The Court finds that, at the very least, Plaintiff is likely to succeed on the merits of its fraud claim.

In order to plead fraud under New York law, a plaintiff must allege (a) a material misrepresentation or omission of fact; (b) defendant's knowledge of the falsity of the statement; (c) intent to defraud; (d) reasonable reliance by the plaintiff; and (e) damage to the plaintiff. *See Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). Because the claim is for fraud, it must satisfy the heightened pleading requirements of Rule 9(b). This requires a plaintiff to specify the fraudulent statements, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004).

Plaintiff's allegations meet each element. Plaintiff alleges that on February 23, 2024, Mott wrote 21 checks in the amount of $20,907,000, drawn on an account purported to be held at Kinecta FCU, except that this account was already closed as of February 19, 2024 and that Mott had notice of its closure. The misrepresentation was in the form of the 21 checks that were written for amounts that allegedly did not exist from an account that was closed. Plaintiff sufficiently alleges Defendants' knowledge of the falsity by alleging that Mott had notice that the Kinecta II account was closed. Intent to defraud is alleged by Mott's repeated attempts to write and deposit checks from the same closed account even after her first two attempts were charged back. Plaintiff alleges a reasonable reliance on Mott's representation because of the "Funds Availability Policy," an FSB policy that honors checks deposited into business bank accounts on the same day to facilitate

smooth operations for the bank's business clients. ECF No. 31 ¶ 4; ECF No. 1 ¶ 32. Plaintiff also alleges further intent to defraud by alleging that Plaintiff knew about the Funds Availability Policy and took advantage of that policy to execute the rapid transfers between accounts. *Id*. As discussed, Plaintiff has also sufficiently alleged damage to it because of the excessively overdrawn accounts.

Plaintiff must also state facts "sufficient to give rise to a strong inference of fraudulent intent." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176 (2d Cir. 2015) (internal quotations omitted). "An inference is strong if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* at 176-77 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007)). "A fraud plaintiff may establish a strong inference of scienter, among other ways, by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 177. In making this determination, the Court must "consider the complaint in its entirety and 'take into account plausible opposing inferences." *Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).

Defendant Mott's repeated attempts to deposit checks from a closed account are sufficient to raise a strong inference of scienter. Once Mott was informed that the checks were dishonored, a reasonable person would likely confirm that money was in the account or confirm that checks were being written from the correct account. Mott did not take either step. Instead, she continued to write checks from the closed account three times over several days, raising a strong inference of scienter. Based on the foregoing, the Court concludes that each element of the fraud claim is sufficiently demonstrated and substantiated with documentary evidence such that Plaintiff is likely to succeed in its fraud claim. Because the fraud claim alone is sufficient to entitle Plaintiff to

16

monetary relief, the Court need not address whether Plaintiff is likely to succeed on its other claims.

"[A] decision to appoint or not to appoint a receiver is committed to the sound discretion of the trial court." *Varsames*, 96 F. Supp. 2d at 365. After considering all of the relevant factors, this Court determines that a receiver is necessary to protect Plaintiff's interest in the $18 million that may be hiding somewhere among the accounts of the various Entity Defendants. Accordingly, Plaintiff's motion to appoint a receiver is granted.  The "Court is appointing a receiver to retain exclusive control over all of the Defendants' [financial] assets, because Plaintiff has sufficiently evidenced fraudulent conduct, imminent danger of the property being lost, a probability of harm to Plaintiff by denial of the appointment, and probable success in the action." *Compass-Charlotte 1031, LLC*, 2024 WL 260507, at *9.

## III.    Authority of Receiver

A receiver's "authority is wholly determined by the order of the appointing court." *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 98 (2d Cir. 1988) (citation omitted). Although Plaintiff requests a receiver that would "make whole any and all parties aggrieved by the Defendants fraudulent scheme," the Second Circuit has cautioned against "us[ing] [a receivership] as an alternative to bankruptcy," and has "disapproved of district courts using receivership as a means to process claim forms and set priorities among various classes of creditors." *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) (citing *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 437-38 (2d Cir. 1987)). "More fundamentally, the authority of a receiver is defined by the entity or entities in the receivership. '[T]he plaintiff in his capacity of receiver has no greater rights or powers than the corporation itself would have.'" *Id.* (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 25 (1st Cir. 1990)). "A receiver may commence lawsuits, but 'stands in the shoes of the

corporation and can assert only those claims which the corporation could have asserted.'" *Id.* (quoting *Lank v. N.Y. Stock Exch.*, 548 F.2d 61, 67 (2d Cir. 1977)).

"While a receiver must be impartial between parties, that impartiality does not extend to [the] relationship with the receivership estate as receivers owe a fiduciary duty to the owners of the property under [the receiver's] care[.]" *Fed. Trade Comm'n v. On Point Glob. LLC*, No. 19-CV-25046, 2020 WL 5819809, *2 (S.D. Fla. Sept. 30, 2020) (quoting *SEC v. Schooler*, No. 3:12-CV-2164, 2015 WL 1510949, *3 (S.D. Cal. Mar. 4, 2015)). The receiver "must protect and preserve the receivership's assets for the benefit of the persons ultimately entitled to it." *Id.* (quotation omitted). "As neutral officers of the court, receivers must avoid the appearance of impropriety or partiality in their actions." *Id.* (quoting *Schooler*, 2015 WL 1510949, at *3).

Plaintiff initially requested that the receiver be granted the authority to manage the ongoing operations of the Entity Defendants, but at oral argument, Plaintiff revised its request to limit the scope of the receiver's authority to managing the financial affairs of the Entity Defendants. Accordingly, upon appointment of the receiver, the receiver shall be granted exclusive dominion and control over the financial affairs of Entity Defendants, including control over all cash, financial assets, and books and records of the Entity Defendants.

## CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby:

**ORDERS** that Plaintiff's motion to appoint a receiver is GRANTED; and the Court further

**ORDERS** that no later than April 5, 2024, the parties shall submit to the Court a proposed order appointing the receiver identifying the name of a proposed receiver and proposing the duties

of the receiver within the scope of authority identified herein. The Court will consider the parties'

suggestions in its order appointing the receiver.

IT IS SO ORDERED.
Dated:  April 4, 2024
Rochester, New York

_____
HON.  FRANK P. GERACI, JR.
United States District Court
Western District of New York