**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIVE STAR BANK, | |
| *Plaintiff,* | CASE NO. 6:24-cv-06153-FPG |
| v. | |
| KATHERINE MOTT-FORMICOLA, | |
| ROBERT HARRIS; KRM EVENTS, LLC; | CIVIL ACTION |
| KATHERINE'S ON MONROE, LLC; THE | |
| DIVINITY ESTATE AND CHAPEL, LLC; | AMENDED COMPLAINT |
| KNC ELEGANCE, LLC d/b/a THE | |
| WINTERGARDEN BY MONROES; 11 | |
| WEXFORD GLEN, LLC; RCC MONROES | |
| LLC; NAF REMODELING LLC; | |
| MONROES AT RIDGEMONT LLC; | |
| CRESCENT BEACH AT THE LAKE LLC; | |
| MOTT MANAGEMENT LLC; KRISTINA | |
| BOURNE; TAYLOR PAGANO; TIMOTHY | |
| LAROCCA, | |
| | |
| *Defendants.* | |

Plaintiff Five Star Bank ("Plaintiff" or "Five Star"), by and through its undersigned attorneys, for its Amended Complaint against defendants KRM Events, LLC; Katherine's on Monroe, LLC; The Divinity Estate and Chapel, LLC; KNC Elegance, LLC d/b/a The Wintergarden by Monroes; 11 Wexford Glen, LLC; RCC Monroes LLC; NAF Remodeling LLC; Monroes at Ridgemont LLC; Crescent Beach at the Lake LLC; Mott Management LLC; (collectively, the "Entity Defendants"), Katherine Mott-Formicola ("Defendant Mott") and Robert Harris ("Defendant Harris"), in their individual capacities and as the controlling members of certain of the Entity Defendants, and Kristina Bourne ("Defendant Bourne"), Taylor Pagano ("Defendant Pagano"), and Timothy Larocca ("Defendant Larocca").(the "Asset Holder Defendants") (collectively, "Defendants"), alleges as follows:

## BACKGROUND

1.      Plaintiff brings this Amended Complaint against Defendants to recover a total of $18.9 million in funds unlawfully obtained by Defendants through a fraudulent check-kiting scheme perpetrated by Defendant Mott using numerous bank accounts associated with the Entity Defendants held at Five Star since 2022 and accounts held at several other local financial institutions.  Plaintiff also brings claims sounding in breach of the operative Deposit Account Agreement governing the at-issue accounts and claims for violations of the Racketeer Influenced Corrupt Organizations Act ("RICO") arising from Plaintiff's corrupt use of her businesses to perpetuate a clear pattern of financial fraud.

2.      Mott, using the Entity Defendants' bank accounts held at Five Star, perpetrated a fraudulent check-kiting scheme in order to artificially inflate the balance of the various Entity Defendants' bank accounts with Plaintiff and create an artificial source of funding. Mott also utilized the Asset Holder Defendants as "mules" to funnel illegally obtained funds out of Five Star, which, the Asset Holder Defendants subsequently held, moved, dissipated, disposed, hid, or otherwise concealed.

3.      This check-kiting scheme was uncovered by Plaintiff, and the subsequent reconciliation of the Entity Defendants' deposit accounts resulted in an overdraft of those accounts in an amount exceeding $18.9  million.

4.      Plaintiff brings this action for fraud, RICO, breach of contract, unjust enrichment, conversion, indemnification, conspiracy to commit a RICO violation, aiding and abetting fraud and money had and received, and  seeks an order requiring Defendants to repay in full the amounts Defendants fraudulently obtained.

29035804.1

## PARTIES

5.      Plaintiff Five Star Bank is a New York State chartered bank under the New York State Banking Laws with a principal place of business in Warsaw, New York.  Five Star offers consumer and commercial banking and lending services to individuals, municipalities, and businesses throughout Central and Western New York.

6.      Upon information and belief, Defendant Katherine Mott is a natural person residing in Rochester, New York.

7.      Upon information and belief, Defendant Robert Harris is a natural person residing in Rochester, New York.

8.      Upon information and belief, Defendant KRM Events, LLC is a New York Limited Liability Company managed, operated, and/or controlled by Defendants Robert Harris and Katherine Mott.

9.      Upon information and belief, Defendant Katherine's on Monroe, LLC is a New York Limited Liability Company managed, operated, and/or controlled by Defendant Katherine Mott.

10.     Upon information and belief, Defendant The Divinity Estate and Chapel, LLC is a New York Limited Liability Company managed, operated, and/or controlled by Defendant Katherine Mott.

11.     Upon information and belief, Defendant KNC Elegance, LLC is a New York Limited Liability Company managed, operated, and/or controlled by Defendant Katherine Mott.

12.     Upon information and belief, Defendant 11 Wexford Glen, LLC is a New York Limited Liability Company managed, operated, and/or controlled by Defendants Mott and Harris.

13.     Upon information and belief, Defendant RCC Monroes LLC is a New York Limited

3

Liability Company managed, operated, and/or controlled by Defendants Mott.

14.   Upon information and belief, Defendant NAF Remodeling LLC is a New York Limited Liability Company managed, operated, and/or controlled by Defendant Katherine Mott.

15.   Upon information and belief, Defendant Monroes at Ridgemont LLC is a New York Limited Liability Company managed, operated, and/or controlled by Defendant Katherine Mott.

16.   Upon information and belief, Crescent Beach at the Lake LLC is a New York Limited Liability Company managed, operated, and/or controlled by Defendant Katherine Mott.

17.   Upon information and belief, Mott Management LLC is a New York Limited Liability Company managed, operated, and/or controlled by Defendant Katherine Mott.

18.   Upon information and belief, Kristina Bourne is a natural person residing in or around Rochester, New York.

19.   Upon information and belief, Taylor Pagano is a natural person residing in or around Rochester, New York.

20.   Upon information and belief, Timothy Larocca is a natural person residing in or around Rochester, New York.

**JURISDICTION AND VENUE**

21.   Jurisdiction is proper because this matter is brought pursuant to 18 U.S.C. § 1964(c), conferring jurisdiction upon an appropriate United States District Court.

22.   Venue is in this district because Defendants are subject to jurisdiction in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**ALLEGATIONS COMMON TO ALL COUNTS**

23.   Defendant Katherine Mott dominated and controlled each of the Entity Defendants

and perpetrated the fraudulent conduct alleged herein such that their separate existence is a sham and respecting the separateness of corporate entities would permit Defendant Mott to abuse the corporate form to commit a fraud causing injury to Five Star Bank.

24.     Mott exercised complete domination over each of the Entity Defendants through sole control over the management and financial affairs of each entity.

25.     Mott exploited and abused the privilege of doing business in the corporate form by using the various Entity Defendants to perpetrate the fraudulent scheme described herein to cause Five Star to wrongfully pay over $20.9 million in funds on behalf of the Entity Defendants by kiting checks between various accounts held at Five Star and elsewhere.

26.     Mott used the Entity Defendants and the Asset Holder Defendants in furtherance of a fraud to her personal benefit by creating a tangled web of transactions to settle and net out, buying further time to defraud Plaintiff out of funds to which Defendant Mott and the Entity Defendants were not entitled.

27.     Defendant Mott is directly affiliated with 30 accounts at Five Star, not including related accounts owned by her children, Nicholas and Christian Formicola. At their highest point, from September 9, 2023 through September 25, 2023, the accounts in the name of Defendant Mott and the Entity Defendants only held about $7 million in aggregate deposits with the Bank. Often, they held much less.

28.     In late 2022 and 2023, Defendant Mott opened 30 business and personal accounts at Five Star. Defendant Mott is an authorized signatory on each of these accounts. The specific dates and account types are detailed as follows:

      a.    On November 29, 2022, Defendant Mott opened seven checking accounts, all "business" accounts on behalf of KRM Events LLC (accounts ending in -0529 and

-0545)[1], KNC Elegance LLC DBA The Wintergarden By Monroe's (account ending in -0588), Katherine's on Monroe LLC (account ending in -0596), The Divinity Estate and Chapel LLC (account ending in -0618), NAF Remodeling LLC (account ending in -0634)  and 11 Wexford Glen LLC (account ending in -0642).

b.   On February 10, 2023, Defendant Mott opened one personal checking account.

c.   On February 14, 2023, Defendant Mott opened one personal CD.

d.   On February 24, 2024, Defendant Mott opened three business CDs, all with an opening deposit of $200,000.

e.   On April 18, 2023, Defendant Mott opened one business account on behalf of Monroes at Ridgemont LLC.

f.   On August 1, 2023, Defendant Mott's father, Roger Mott, opened one personal CD and named Defendant Mott as a beneficiary on the account.

g.   On August 22, 2023, Defendant Mott opened one personal money market account with her son, Nicholas Formicola as beneficiary, and Defendant Robert Harris opened one money market account with Defendant Mott as the beneficiary.

h.   On August 23, 2023, Defendant Mott's father, Roger Mott, opened one personal money market account with Defendant Mott as beneficiary.

i.   On September 6, 2023, Defendant Mott opened two business money market accounts for NAF Remodeling LLC and 11 Wexford Glen LLC.

---

[1] Defendants Mott and Harris opened a business demand deposit account with Five Star in the name of KRM Events LLC under account number ending in -0529. Both Defendant Mott and Defendant Harris are authorized signatories for account ending in -0529. Defendant Mott also opened a second business demand deposit account with Five Star in the name of KRM Events LLC under account number ending in -0545. Mott is an authorized signatory for account ending in -0545.

j.   On September 7, 2023, Defendant Mott opened three business money market accounts—two for KRM Events LLC and one for The Divinity Estate and Chapel LLC.

k.   On October 3, 2023, Defendant Mott opened two business accounts, one demand deposit account and one money market account, for RCC Monroes LLC and Monroes at Ridgemont LLC, respectively.

l.   On October 26, 2023. Defendant Mott opened one business money market account for KNC Elegance LLC d/b/a The Wintergarden By Monroes.

m.   On October 27, 2023, Defendant Mott opened one business money market account for Katherine's on Monroe LLC.

n.   On November 16, 2023, Defendant Mott opened two business accounts, one demand deposit account and one money market account, for Crescent Beach at the Lake LLC.

o.   On January 11, 2024, Defendant Mott opened two business accounts, one demand deposit account and one money market account for Mott Management LLC.

**The Fraudulent Check Kiting Scheme**

29.   Nearly immediately after Defendant Mott opened the first of the above accounts, on or about December 9, 2022, Mott, assisted by and acting in concert with the other Defendants, continued the pattern and practice of kiting checks she had begun previously at her prior banking institutions and began a pattern and practice of "rapidly moving funds" between Five Star and other financial institutions.

30.   At a high level, through this scheme, Defendant Mott would routinely deposit high dollar amount checks into the accounts of the Entity Defendants held at Five Star from bank

7

accounts the Entity Defendants maintained at other institutions, namely Kinecta Federal Credit Union ("Kinecta FCU"), for which insufficient funds existed.

31.     It is important to note that no actual funds were moving around, as the funds did not actually exist. Instead, Defendant Mott "gamed the system" by taking advantage of the delays inherent in bank check clearing and processing practices and associated funds availability policies. Effectively, Defendant Mott created the impression of funds by rapidly writing and depositing checks back and forth between financial institutions. This is the practice commonly known as "check-kiting."

32.     Throughout the time Defendant Mott and the Entity Defendants were Five Star depositors, Mott continued to engage in this illegal practice of "check kiting" by rapidly writing and depositing checks between Five Star and Kinecta FCU to create the perception that Defendants had funds available in their respective accounts when they did not.

33.     Upon information and belief, Defendant Mott engaged in check-kiting at other financial institutions as early as 2019, well before Mott opened the various accounts at Five Star in late 2022 and early 2023. This pattern and practice was well established by 2022.

34.     For example, Evans Bank closed accounts affiliated with Defendant Mott and the Entity Defendants in late 2022 for check-kiting and check fraud activity in 2022.

35.     Similarly, Lyons National Bank closed accounts affiliated with Defendant Mott and the Entity Defendants in late 2022 due to suspected check-kiting.

36.     Canandaigua Bank and Trust  also closed accounts affiliated with Defendant Mott and the Entity Defendants in 2022.

37.     Upon information and belief, Tompkins Community Bank also involuntarily closed accounts affiliated with Defendant Mott in 2019 due to inappropriate transaction history.

38.     The Entity Defendants' Five Star account records are replete with examples of "check kiting," and occurred nearly on a weekly basis from December 2022 through February 2024.

39.     Upon information and belief, Defendant Mott engaged in this check-kiting activity—at Five Star and at various other financial institutions—as a regular way of operating her various businesses on behalf of the Entity Defendants (sometimes referred to as the "Corrupt Enterprise").

40.     Defendant Mott was able to pull funds out of Five Star illegally by presenting in person at the Five Star branch, nearly on a daily basis, and instructing the Five Star teller working to issue her cashier's and/or counter checks for large sums.

41.     Defendant Mott requested that these checks be made payable to other individuals, including the Asset Holder Defendants, all of whom are employed by Defendant Mott or the Entity Defendants. Upon information and belief, these checks were for no legitimate business purpose and were requested solely to further the Defendants' illegal scheme.

42.     The teller at the Five Star branch would provide the requested checks to Defendant Mott and Defendant Mott would then leave the Five Star branch with these checks.

43.     Upon information and belief, Defendant Mott provided these checks to the Asset Holder Defendants, who thereafter held, moved, dissipated, disposed of, hid, and otherwise concealed the proceeds of the check-kiting scheme.

44.     Defendant Mott's rapid check-kiting between financial institutions to create the false perception of available funds came to a crescendo in February and March 2024.

45.     Between February 22, 2024 and March 5, 2024, Defendant Mott deposited or caused to be deposited approximately 68 checks in an aggregate amount exceeding $62 million

9

into the various accounts held in the name of the Entity Defendants held at Five Star.

46.     Mott deposited each of those checks with Five Star despite knowing that the check amounts exceeded the balance of the Kinecta FCU accounts from which they would be drawn, and additionally, with express knowledge that the accounts held by Defendant Mott and the Entity Defendants at Kinecta FCU were officially closed on or about February 19, 2024.

47.     Specifically, on February 22, 2024, Defendant Mott deposited 42 checks drawn on Five Star at Kinecta FCU totaling $20,922,000. This transaction was processed at Kinecta FCU on February 22, 2024, and the funds were pulled from Five Star via the Federal Reserve check-clearing process on February 23, 2024.

48.     On February 23, 2024, Defendant Mott deposited 21 checks drawn on Kinecta FCU at Five Star totaling $20,907,000. These funds were made available to Defendant Mott that evening during the end of day processing and were ultimately drawn on to fund the 42 check deposits at Kinecta FCU made on February 22, 2024.

49.     On February 26, 2024, Defendant Mott deposited 21 checks drawn on Kinecta FCU at Five Star totaling $20,907,000.

50.     On February 28, 2024, the 21 checks deposited by Defendant Mott were charged back by Kinecta FCU. Because a second round of checks were deposited by Defendant Mott on February 26, 2024, the chargebacks by Kinecta FCU did not result in a negative balance with Five Star, as Defendant Mott, consistent with her check kiting scheme, was taking advantage of delays inherent in check processing and clearance.

51.     On the morning of February 29, 2024, Defendant Mott deposited 21 checks drawn on Kinecta FCU at Five Star totaling $20,907,000. Five Star's Fraud Department was made aware of the February 28, 2024 chargebacks in the early afternoon and moved to restrict all accounts

associated with Defendant Mott and the Entity Defendants. That evening, the 21 checks deposited on February 26, 2024 were charged back by Kinecta FCU. Because a third round of checks were deposited earlier in the day, the chargebacks did not, at this time, result in a negative balance to Five Star.

52.     On March 5, 2024, the 21 checks deposited on February 29, 2024 were charged back by Kinecta FCU. Because no additional deposits had been made, these charge backs resulted in significant negative balances on the impacted accounts at Five Star (approximately $20.7 million). True and accurate copies of the checks are attached as **Exhibit A**.

53.     Mott issued checks drawn on the Entity Defendants' Five Star accounts and directed funds transfers out of those accounts totaling over $20.9 million despite knowing the checks she previously deposited with Five Star would ultimately be dishonored for insufficient funds in the originating accounts and because the accounts at Kinecta FCU had been closed.

54.     Upon learning of the negative balances, Five Star immediately notified Defendant Mott that the checks she deposited bounced for insufficient funds and that she had on ongoing obligation, pursuant to the Deposit Account Agreement, to bring the negative balances to zero.

55.     Five Star personnel had multiple daily calls with Defendant Mott between March 6 and March 8, 2024 regarding the negative balance. During that period of time, Defendant Mott falsely represented to Five Star that there must have been some type of "book keeping error" and assured Five Star that she would immediately restore the monies owed.

56.     Specifically, Defendant Mott promised Five Star that she would make a $16 million dollar payment from Wells Fargo to apply to the checks that bounced, despite knowing that she did not have sufficient funds to make such a payment.

57.     Obviously, Defendant Mott failed to deliver on these promises.

29035804.1

58.     Five Star was only able to modestly offset a small portion of its substantial losses with other funds held or controlled by Mott as permitted under the operative Deposit Account Agreement.

59.     To date, none of the Defendants, despite demand, have restored monies from the bounced checks, and have failed and refused to repay a single dollar to Five Star.

60.     Accordingly, Five Star has suffered losses of at least $18.9 million as a direct result of Mott and the Entity Defendants' check-kiting scheme.

61.     But for the filing of this lawsuit and Five Star taking steps to restrict her ability to write further checks against the accounts affiliated with Entity Defendants, Defendant Mott would have continued the pattern of rapidly writing checks in and out of Five Star to create the perception of available funds.

62.     Moreover, but for the appointment by this Court of the Receiver to oversee and manage the Entity Defendants' finances, and as evidenced by Defendant Mott's empty "promises" to restore the stolen funds to Five Star, Defendant Mott and the Entity Defendants would have continued to utilize accounts at other banks, and non-bank financial institutions, such as Community Bank, Wells Fargo, JP Morgan Chase, Summit Federal Credit Union and Alliance Payroll to further the goals of the Corrupt Enterprise and conceal Defendants' wrongfully obtained assets.

63.     Additionally, Defendant Mott was, and is, acting in concert with the other Defendants, including the Asset Holder Defendants, who are still able to further the goals of the Corrupt Enterprise by holding, hiding and concealing the proceeds of the illegal check-kiting scheme.

12

**Defendants Violated the Five Star Deposit Agreement**

64.     As a result of the wrongful activity by Defendant Mott, each of the foregoing accounts are currently overdrawn in the amounts set forth below:

| Account Holder | Account Number Ending | Current Balance |
|---|---|---|
| KRM Events, LLC | 0529 | $ (3,482,241.59) |
| KRM Events, LLC | 0545 | $ (3,294,566.80) |
| KNC Elegance, LLC | 0588 | $ (3,879,031.41) |
| Katherine's on Monroe, LLC | 0596 | $ (4,868,265.06) |
| The Divinity Estate and Chapel, LLC | 0618 | $ (3,454,900.93) |

65.     The operative Deposit Account Agreement(s) governing the at-issue  Five Star accounts provides, in relevant part:

> **B. Responsibility to Repay.**
> You are responsible for any negative balances in your Account. This includes Overdrafts and any associated fees. . . . You agree to pay all costs and expenses we incur in collecting any Overdraft. We may still pursue collection of the amount you owe (including taking legal action against you) after it is charged off.

66.     Pursuant to the operative Deposit Account Agreement(s), Mott and the Entity Defendants remain responsible for paying the negative balances in each of the Entity Defendants' accounts. A true and accurate copy of the Deposit Account Agreement is attached as **Exhibit B.**

67.     To be clear, the business relationship between Defendant Mott, Defendant Harris, the Entity Defendants and Five Star has not yet terminated because of Defendant Mott, Harris and the Entity Defendants' ongoing obligation to bring their negative account balances to zero pursuant to the Deposit Account Agreement(s). *See* Exhibit B.

68.     To date, neither Mott nor the Entity Defendants have resolved these overdrafts, which total approximately $18.9 million dollars.

13

69.     Because they have failed to cure these account overdrafts, Mott and the Entity Defendants are in breach of the Deposit Account Agreement and liable to Plaintiff in an amount no less than the total overdraft amount.

**Mott and the Entity Defendants Must Indemnify and Defend Five Star**

70.     As stated, Mott and the Entity Defendants' fraudulent course of conduct also defrauded other banking institutions, such as Kinecta FCU.

71.     In addition to the losses it has incurred as a result of Defendants' conduct,  Five Star may be the subject of claims for losses and damages incurred by other institutions utilized by Defendants in connection with their financial malfeasance.

72.     The operative Deposit Account Agreement(s) expressly allocate the risk of such losses to Defendants, providing, in relevant part, that:

> [Accountholder] will defend, indemnify and hold harmless FIVE STAR and its service providers against and in respect to any and all loss, liability, expense and damage, including consequential, special and punitive damages, directly or indirectly resulting from:
>     i.    the processing of any request received by FIVE STAR relating to your Accounts;
>    ii.    any breach of the provisions of this Agreement;
>   iii.    [ ]
>    iv.    any dispute between you and any third party in connection with your Account;
>     v.    relying upon instructions from you or someone purporting to be you;
>    vi.    insufficient funds in your Account or any returned deposits on your Account and
>   vii.    any and all actions, suits, proceeding, claims, demands, judgments, costs and expenses (including attorney's fees) incident to the foregoing.

73.      Five Star has suffered a loss of no less than $18.9 million as a result of "insufficient funds in [Defendants'] Account[s] or any returned deposits on [Defendants'] Account[s]."

74.     Further, Five Star may be subject to claims by other persons or entities for damages suffered in connection with Defendants' fraudulent conduct.

14

75.    Accordingly, Defendant Mott, Defendant Harris and the Entity Defendants must indemnify Five Star for its losses resulting from Defendants' fraudulent deposits and wrongful use of funds to which they were not entitled and wrongfully credited to their accounts in connection with their check kiting scheme, including, but not limited to, its losses totaling over $18.9 million and for any claims by any other person or entity arising from Defendants' check kiting scheme.

**Defendants' Corrupt Enterprise**

76.    Defendant Mott operated and continues to operate a RICO enterprise engaged in interstate and foreign commerce that directly targeted Five Star through a pattern of criminal conduct (the "Corrupt Enterprise").

77.    At all times relevant to this Complaint, Defendant Mott wrongfully utilized entities that were operating as lawful businesses, the Entity Defendants, in furtherance of the commission of a pattern of criminal financial misconduct.

78.    Defendants' pattern of criminal conduct occurred in the course of interstate commerce in utilizing facilities including the Federal Reserve's SWIFT system for the transfer of funds and interstate automated clearinghouse (ACH) facilities for fraudulent financial transactions, all in violation of 18 U.S.C. § 1344.

79.    Defendants repeatedly and intentionally violated, *inter alia*, 18 USC § 1344, which proscribes any scheme to defraud a federally-insured financial institution to obtain any monies, credits, assets, securities, or other property owned by, or under the control of, such institution.

80.    Moreover, Defendants repeatedly violated 18 U.S.C. § 1957 through their attempts to knowingly engage in monetary transactions in criminally derived property greater than $10,000.00, specifically, in repeatedly attempting to deposit and withdraw funds based on dishonored or knowingly fraudulent checks.

15

81.     Defendants' conduct constitutes a pattern of "racketeering activity" within the meaning of 18 U.S.C § 1961(1).

82.     Harm to Five Star from this pattern of criminal conduct was foreseeable and, in fact, Five Star was directly and proximately harmed by reason of Defendants' racketeering activity and fraudulent scheme in the amount of at least $18.9 million.

83.     Upon information and belief, Defendant Mott continues to utilize the Entity Defendants to perpetuate her financial schemes and avoid accountability for liability by wrongfully exploiting the corporate form.

84.     Defendants' conduct described herein constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

85.     Plaintiff has been injured as a direct and proximate result of Defendants' racketeering activity, unlawful conduct, and RICO enterprise.

86.     Plaintiff is entitled to recover treble damages plus costs and attorneys' fees from Defendants pursuant to 18 U.S.C. § 1964(c).

**The Asset Holder Defendants Bourne, Pagano, Harris and Larocca's Participation in the Corrupt Enterprise**

87.     Upon information and belief, the Asset Holder Defendants Bourne, Pagano, Harris and Larocca are all employed by, were previously employed by, or otherwise associated with, the Defendant Mott and/or the Entity Defendants.

88.     Upon information and belief, the Asset Holder Defendants participated  in the criminal enterprise by knowingly receiving the proceeds of the check-kiting scheme and diverting, disposing, concealing the funds and serving as mules to move the illegal proceeds.

89.     Upon information and belief, Defendant Bourne is the office manager at Monroe's Restaurant, one of the restaurants owned and operated by Defendant Mott and/or the Entity

29035804.1

Defendants.

90.      Upon information and belief, Defendant Pagano is an event coordinator at The Wintergarden by Monroe's and a manager at Monroe's Restaurant, both of which are establishments owned and operated by Defendant Mott and the Entity Defendants.

91.      Upon information and belief, Defendant Harris is married to Defendant Mott and is a partial owner of and/or employed by the Entity Defendants.

92.      Upon information and belief, Defendant Larocca was previously employed as an executive chef at The Wintergarden by Monroe's, an establishment owned and operated by Defendant Mott and the Entity Defendants.

93.      Upon information and belief, the Asset Holder Defendants knowingly and wrongfully held, moved, dissipated, disposed of, hid, and otherwise concealed millions of dollars in ill-gotten gains Defendant Mott and the Entity Defendants obtained via the Corrupt Enterprise.

94.      Upon information and belief, Defendant Mott utilized the Asset Holder Defendants as "mules" by directing each of the Asset Holder Defendants to move and otherwise obfuscate the illegally acquired funds from Five Star.

95.      Upon information and belief, the Asset Holder Defendants did move and otherwise obfuscate the illegally acquired check-kiting proceeds in exchange for compensation, or other financial or non-financial renumeration, from Defendant Mott and/or the Entity Defendants.

96.      Upon information and belief, there was no valid business purpose or otherwise legitimate explanation for the payments made by Defendant Mott and the Entity Defendants to the Asset Holder Defendants.

97.      Between December 2022 and February 2024, Defendant Bourne received at least $3,739,392.94 from Defendant Mott and/or the Entity Defendants as part of the Corrupt Enterprise.

Copies of the checks issued to Defendant Bourne from Defendant Mott and the Entity Defendants are attached hereto as **Exhibit C**, and are summarized as follows:

| Date | Amount |
|---|---|
| December 2022 | $   176,434.56 |
| January 2023 | $   423,986.45 |
| February 2023 | $   382,360.15 |
| March 2023 | $   491,146.04 |
| April 2023 | $   205,002.79 |
| May 2023 | $   406,693.72 |
| June 2023 | $   389,266.29 |
| July 2023 | $   552,557.02 |
| August 2023 | $   421,529.23 |
| September 2023 | $    54,887.98 |
| October 2023 | $   136,864.37 |
| November 2023 | $    22,000.00 |
| December 2023 | $    62,227.45 |
| January 2024 | $    14,436.89 |
| Total | $ 3,739,392.94 |

98.     Between December 2022 and February 2024, Defendant Pagano received at least $1,795,829.54 from Defendant Mott and/or the Entity Defendants as part of the Corrupt Enterprise. Copies of the checks issued to Defendant Pagano from Defendant Mott and the Entity Defendants are attached hereto as **Exhibit D**, and are summarized as follows:

| Date | Amount |
|---|---|

| | |
|---|---|
| December 2022 | $ 65,739.00 |
| January 2023 | $ 199,991.00 |
| February 2023 | $ 215,357.00 |
| March 2023 | $ 108,873.00 |
| April 2023 | $ 124,266.00 |
| May 2023 | $ 186,393.71 |
| June 2023 | $ 234,619.26 |
| July 2023 | $ 211,040.00 |
| August 2023 | $ 300,096.45 |
| September 2023 | $ 61,527.00 |
| November 2023 | $ 47,777.12 |
| December 2023 | $ 26,150.00 |
| February 2024 | $ 14,000.00 |
| Total | $ 1,795,829.54 |

99.     Between December 2022 and February 2024, Defendant Harris received at least $1,543,197.81 from Defendant Mott and/or the Entity Defendants as part of the Corrupt Enterprise. Copies of the checks issued to Defendant Harris from Defendant Mott and the Entity Defendants are attached hereto as **Exhibit E**, and are summarized as follows:

| Date | Amount |
|---|---|
| December 2022 | $ 410,000.00 |
| January 2023 | $ 55,572.41 |

| | |
|---|---|
| February 2023 | $ 56,621.82 |
| March 2023 | $ 102,520.76 |
| April 2023 | $ 138,582.02 |
| May 2023 | $ 97,695.04 |
| June 2023 | $ 188,886.71 |
| July 2023 | $ 159,653.89 |
| August 2023 | $ 191,285.20 |
| September 2023 | $ 47,947.84 |
| October 2023 | $ 82,491.39 |
| November 2023 | $ 11,940.73 |
| Total | $ 1,543,197.81 |

100.    Between December 2022 and February 2024, Defendant Larocca received at least $428,983.63 from Defendant Mott and/or the Entity Defendants as part of the Corrupt Enterprise. Copies of the checks issued to Defendant Larocca from Defendant Mott and the Entity Defendants are attached hereto as **Exhibit F**, and are summarized as follows:

| Date | Amount |
|---|---|
| December 2022 | $ 20,000.00 |
| January 2023 | $ 33,400.00 |
| February 2023 | $ 61,200.00 |
| March 2023 | $ 53,700.00 |
| April 2023 | $ 55,700.00 |
| May 2023 | $ 56,400.00 |

20

| | |
|---|---|
| June 2023 | $   55,089.36 |
| July 2023 | $   19,241.00 |
| August 2023 | $   55,453.27 |
| December 2023 | $   18,800.00 |
| Total | $  428,983.63 |

101.    By knowingly receiving, holding, moving, dissipating and concealing the proceeds from Defendant Mott's illegal check-kiting scheme, the Asset Holder Defendants participated in, and acted in furtherance of, the conspiracy and the Corrupt Enterprise.

102.    Upon discovery of the aforementioned payments to the Asset Holder Defendants, Five Star, through counsel, demanded the return of the illegally obtained funds or, alternatively, an explanation of the valid business purpose(s) for which these payments were made or otherwise provide a legitimate explanation for the same.

103.    To date, the Asset Holder Defendants have neither returned any funds nor provided a legitimate explanation for why Defendant Mott and the Entity Defendants made these payments to each of them.

## COUNT I
### (Fraud -  As Against Defendant Mott, Defendant Harris and the Entity Defendants)

104.    Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

105.    Defendant Mott and the Entity Defendants knowingly engaged in a scheme or artifice to defraud Five Star by knowingly presenting checks for deposit and issuing checks despite knowing that the account paying the check did not have sufficient funds to cover those checks.

106.    Specifically, Defendant Mott and the Entity Defendants wrote over 68 negotiable instruments in the form of checks beginning on February 22, 2024, for deposit in various accounts

21

maintained by Defendants at Five Star.

107.    Upon information and belief, Defendant Mott and the Entity Defendants wrote or caused to be written such checks knowing there were insufficient funds in the accounts on which the checks were drawn.  A spreadsheet is attached hereto as **Exhibit G** to detail the wrongful checks and negative balances of the overdrawn accounts.

108.    Plaintiff reasonably relied on the negotiable instruments submitted for deposit to or issued from any of the at-issue accounts being valid and supported by sufficient funds.

109.    However, Defendant Mott and the Entity Defendants knew that the negotiable instruments issued from the at-issue  Five Star accounts or presented for deposit into those accounts would be dishonored for lack of funds.

110.    The pattern of the checks, including the amounts and fact that they went repeatedly between accounts owned by the Entity Defendants, and, upon information and belief, beneficially owned by Defendant Mott, is strong evidence that Defendant Mott and the Entity Defendants acted with the intent to deprive Five Star of funds.

111.    Defendant Mott and the Entity Defendants knowingly engaged in this wrongful conduct with the intent of wrongfully obtaining funds to which they were never entitled.

112.    As a direct result of Defendant Mott and the Entity Defendants ' fraudulent scheme, Five Star has suffered losses totaling no less than $18.9 million.

113.    WHEREFORE Plaintiff respectfully requests that this Court enter an Order in favor of Plaintiff and against Defendant Mott and the Entity Defendants in the amount of $18,979,005.79, plus all accruing interest amounts through the date of judgment and thereafter at the maximum post-judgment interest rate permitted by law, plus all costs of collection (including, without limitation, reasonable attorneys' fees).

## COUNT II
### (RICO – 18 U.S.C. § 1964(c) –

**As Against Defendant Mott, Defendant Harris and the Entity Defendants)**

114.     Plaintiff incorporates each of the foregoing the allegations as if fully set forth herein.

115.     At all relevant times, Plaintiff was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

116.     At all relevant times, Defendant Mott and the Entity Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c) (collectively, the "RICO Defendants")

117.     The RICO Defendants engaged and participated in a criminal enterprise whose activities affect interstate commerce by way of an elaborate check-kiting scheme that involved Defendant Mott, on behalf of herself and the Entity Defendants, writing and depositing checks, in rapid succession and in substantial amounts, between financial institutions for which insufficient funds existed.

118.     The RICO Defendants knowingly used fraudulently-obtained and non-consensual extensions of credit by depositing fraudulent and worthless checks and using that income to issue additional, fraudulent checks and/or directing Five Star to make electronic payments using such unlawfully-obtained credit.

119.     Using the artificially-inflated account balances created when Defendant Mott deposited these fraudulent checks, Defendant Mott issued checks drawn on the Entity Defendants' Five Star accounts and directed funds transfers out of those accounts totaling over $20.9 million.

120.     These acts individually constitute "racketeering activities" within 18 U.S.C. §

23

1965(1) and collectively constitute a "pattern of racketeering activity" within 18 U.S.C. § 1965(5).

121.    Each RICO Defendant, by engaging in the acts set forth above, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, § 18 U.SC. 1961(1) and (5), in violation of 18 U.S.C. § 1962(c).

122.    Each RICO Defendant committed and/or aided and abetted the commission of two or more of these racketeering acts in violation of 18 U.S.C. § 1344 and/or 18 U.S.C. § 1957.

123.    The RICO Defendants' racketeering acts were multiple, repeated and comprised of hundreds (and likely even thousands) of illegal financial transactions that occurred over a substantial period of time. The predicate acts were related to each other by virtue of common participants (*i.e.*, the named Defendants); common and numerous victims (*i.e* Five Star, Kinecta FCU, Evans Bank, Canandaigua Bank and Trust, Tompkins Bank, Lyons National Bank, and likely other financial institutions); a common method of commission (*i.e* check-kiting); and the common purpose and result of unjustly enriching the Defendants while concealing their unlawful activities.

124.    Five Star was directly and proximately injured by the RICO Defendants' pattern of racketeering activity in an amount equal to or exceeding $18.9 million.

125.    The full scope of the RICO Defendants' Corrupt Enterprise is not known, and the RICO Defendants' demonstrated pattern of deceptiveness indicates they may have perpetuated their scheme through additional entities not yet known.

126.    WHEREFORE Plaintiff respectfully requests that this Court enter a judgment against Defendant Mott and the Entity Defendants in an amount equal to three times the damages Plaintiff sustained pursuant to 18 U.S.C. § 1965(c).

29035804.1

## COUNT III
### (Breach of Contract - As Against Defendant Mott and the Entity Defendants)

127.    Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

128.    Under the Deposit Account Agreement governing each of the at-issue accounts, the account holder is responsible for curing any negative balance in any of its accounts.

129.    Presently, the account held in the name of KRM Events LLC ending in -0529, has a balance of negative $3,482,241.59.

130.    Presently, the account held in the name of KRM Events LLC ending in -0545, has a balance of negative $3,294,566.80.

131.    Presently, the account held in the name of KNC Elegance, LLC ending in -0588, has a balance of negative $3,879,031.41.

132.    Presently, the account held in the name of Katherine's on Monroe, LLC ending in -0596, has a balance of negative $4,868,265.06.

133.    Presently, the account held in the name of The Divinity Estate and Chapel, LLC ending in -0618, has a balance of negative $3,454,900.93.

134.    These negative account balances breach the governing Deposit Account Agreements' requirements that the account holder cure all negative balances and all accounts must have a minimum balance of $.01.

135.    Because she is the authorized signatory for each account and each entity operated as Defendant Mott's alter ego, Defendant Mott is jointly and severally liable with each of the Entity Defendants to Five Star in an amount equal necessary to restore each balance to $0.01.

136.    Accordingly, Defendants are liable to Plaintiff for an amount no less than necessary to cure each negative account balance to no less than $.01.

137.    WHEREFORE Plaintiff respectfully requests that this Court enter an Order in favor of Plaintiff and against Defendant Mott and the Entity Defendants in the amount of $18,979,005.79, <u>plus</u> all accruing interest amounts through the date of judgment and thereafter at the maximum post-judgment interest rate permitted by law, <u>plus</u> all costs of collection (including, without limitation, reasonable attorneys' fees).

**<u>COUNT IV</u>**
**(Unjust Enrichment – As Against Defendant Mott and the Entity Defendants)**

138.    Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

139.    Defendant Mott and the Entity Defendants engaged in an illegal pattern or practice of rapidly writing and depositing checks between Five Star and Kinecta FCU to create the perception that they had funds available in their respective Five Star accounts when they did not.

140.    As a result of this practice, Defendant Mott and the Entity Defendants were able to illegally and by fraudulent means funnel large sums of money out of Five Star for their own personal use.

141.    Defendant Mott and the Entity Defendants had no right to, or ownership over, the funds funneled out of Five Star, as those funds were the rightfully belonged to Plaintiff.

142.    Accordingly, Defendant Mott and the Entity Defendants have been unjustly enriched at the expense of Plaintiff in an amount exceeding $18.9 million.

143.    It is against equity and good conscience to permit Defendant Mott and the Entity Defendants to retain these illegally obtained funds to which they are not entitled.

144.    WHEREFORE Plaintiff respectfully requests that this Court enter an Order in favor of Plaintiff and against Defendant Mott and the Entity Defendants in the amount of $18,979,005.79, <u>plus</u> all accruing interest amounts through the date of judgment and thereafter at the maximum post-judgment interest rate permitted by law, <u>plus</u> all costs of collection (including,

26

without limitation, reasonable attorneys' fees).

<u>**COUNT V**</u>
**(Conversion – As Against Defendant Mott and the Entity Defendants)**

145.    Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

146.    Defendant Mott and the Entity Defendants engaged in an illegal pattern or practice of rapidly writing and depositing checks between Five Star and Kinecta FCU to create the perception that they had funds available in their respective Five Star accounts when they did not.

147.    As a result of this practice, Defendant Mott and the Entity Defendants were able to illegally and by fraudulent means funnel large sums of money rightfully belonging to Plaintiff out of Five Star.

148.    Accordingly, Defendant Mott and the Entity Defendants intentionally and without authority, assumed and exercised control over specifically identifiable funds belonging to Plaintiff, thereby interfering with Plaintiff's right of possession.

149.    At all relevant times, Plaintiff had a possessory right or interest in the specifically identifiable funds illegally funneled out of Five Star by Defendant Mott and the Entity Defendants.

150.    As a direct and proximate result of Defendant Mott and the Entity Defendants' wrongful and illegal conduct, Plaintiff has been damaged in an amount exceeding $18.9 million.

151.    WHEREFORE Plaintiff respectfully requests that this Court enter an Order in favor of Plaintiff and against Defendant Mott and the Entity Defendants in the amount of $18,979,005.79, <u>plus</u> all accruing interest amounts through the date of judgment and thereafter at the maximum post-judgment interest rate permitted by law, <u>plus</u> all costs of collection (including, without limitation, reasonable attorneys' fees).

<u>**COUNT VI**</u>
**(Collection on Debt - As Against Defendant Mott and the Entity Defendants)**

27

152.     Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

153.     Under the Deposit Account Agreement governing each of the at-issue accounts, the account holder is responsible for curing any negative balance in any of its accounts. Presently, the account held in the name of KRM Events LLC ending in -0529, has a balance of negative $3,482,241.59.

154.     Presently, the account held in the name of KRM Events LLC ending in -0545, has a balance of negative $3,294,566.80.

155.     Presently, the account held in the name of KNC Elegance, LLC ending in -0588, has a balance of negative $3,879,031.41.

156.     Presently, the account held in the name of Katherine's on Monroe, LLC ending in -0596, has a balance of negative $4,868,265.06.

157.     Presently, the account held in the name of The Divinity Estate and Chapel, LLC ending in -0618, has a balance of negative $3,454,900.93.

158.     Accordingly, Defendants are liable to Plaintiff for no less than $18,979,005.79, which is the total amount necessary to satisfy Defendants' presently owing debt in the same amount.

159.     WHEREFORE Plaintiff respectfully requests that this Court enter an Order in favor of Plaintiff requiring Defendant Mott and the Entity Defendants to pay Plaintiff no less than $18,979,005.79.

## COUNT VII
### (Indemnification - As Against Defendant Mott and the Entity Defendants)

160.     Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

161.     The parties' relationship is governed by the terms of the operative Deposit Account Agreement.

29035804.1

162.    Pursuant to that Agreement, Defendant Mott and the Entity Defendants are required to indemnify Plaintiff for any against and in respect to any and all loss, liability, expense and damage, including consequential, special and punitive damages, directly or indirectly resulting from:

     i.    the processing of any request received by FIVE STAR relating to your Accounts;

    ii.    any breach of the provisions of this Agreement . . .

   iii.    insufficient funds in your Account or any returned deposits on your Account and

   iv.    any and all actions, suits, proceeding, claims, demands, judgments, costs and expenses (including attorney's fees) incident to the foregoing.

163.    Five Star has suffered losses in an amount no less than $18.979,005.79 directly resulting from "insufficient funds in [Defendants'] Account[s] or any returned deposits on [Defendants'] Account[s]" and will be subject to further legal action by other victims of Defendants' fraudulent conduct.

164.    Accordingly, Defendant Mott and the Entity Defendants are obligated to indemnify Five Star for its losses in an amount no less than $18,979,005.79, plus Five Star's reasonable attorneys' fees and expenses incurred in prosecuting this action.

165.    Moreover, Defendant Mott and the Entity Defendants are obligated to indemnify and defend Five Star for any suit by any third party arising from their fraudulent conduct.

166.    WHEREFORE Plaintiff respectfully requests that this Court enter an Order in favor of Plaintiff and against Defendant Mott and the Entity Defendants in the amount of $18,979,005.79, plus all accruing interest amounts through the date of judgment and thereafter at the maximum post-judgment interest rate permitted by law, plus all costs of collection (including, without limitation, reasonable attorneys' fees), directing that Defendant Mott and the Entity Defendants must defend and indemnify Plaintiff in any litigation arising from the conduct alleged

herein, and for such other and further relief to Plaintiff as this Court deems just, proper, and equitable under the circumstances.

**COUNT VIII**
**(Conspiracy to Violate RICO – 18 U.S.C. § 1962(d) – As Against All Defendants)**

167.    Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

168.    At all relevant times, Plaintiff was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

169.    At all relevant times, Defendant Mott, the Entity Defendants and the Asset Holder Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

170.    As alleged above, Defendant Mott, utilizing the Entity Defendants and the Asset Holder Defendants, engaged in a conspiracy to commit, and did ultimately commit, substantive civil RICO violations by way of an elaborate check-kiting scheme that involved Defendant Mott, on behalf of herself and the Entity Defendants, writing checks, in rapid succession and in substantial amounts, between financial institutions for which insufficient funds existed.

171.    By taking advantage of the delay inherent in bank reconciliation of deposits, Defendant Mott and the Entity Defendants were able to temporarily inflate the cash balance in the Entity Defendants' accounts to create the appearance of additional cash despite insufficient funds to honor the checks being written by Defendant Mott.

172.    Using the artificially-inflated account balances created when Defendant Mott deposited these fraudulent checks, Defendant Mott issued checks drawn on the Entity Defendants' Five Star and directed funds transfers out of those accounts totaling over $20.9 million.

173.    These acts individually constitute "racketeering activities" within 18 U.S.C. § 1965(1) and collectively constitute a "pattern of racketeering activity" within 18 U.S.C. § 1965(5).

174.    Five Star was directly and proximately injured by Defendant Mott and the Entity

30

Defendants' pattern of racketeering activity in an amount equal to or exceeding $18.9 million.

175.    Each Defendant was associated with the Corrupt Enterprise and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Corrupt Enterprise through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(d).

176.    Upon information and belief, the Asset Holder Defendants agreed to join in, and knowingly participated in, the Corrupt Enterprise by making an agreement to receive, and actually receiving, proceeds from Defendant Mott's illegal check-kiting scheme to which they were knowingly not entitled to receive or possess. Upon information and belief, the Asset Holder Defendants acted as "mules" for the Defendant Mott by moving the illegally obtained funds from Five Star to further the goals of the Corrupt Enterprise.

177.    Upon information and belief, the Asset Holder Defendants knowingly received, held, dissipated, hid, concealed and otherwise obfuscated millions of dollars in ill-gotten gains Defendant Mott and the Entity Defendants obtained via the Corrupt Enterprise.

178.    Upon information and belief, between December 2022 and February 2024, Defendant Bourne received at least $3,739,392.94 from Defendant Mott and/or the Entity Defendants as part of the Corrupt Enterprise; Defendant Pagano received at least $1,795,829.54 from Defendant Mott and/or the Entity Defendants as part of the Corrupt Enterprise; Defendant Harris received at least $1,543,197.81 from Defendant Mott and/or the Entity Defendants as part of the Corrupt Enterprise; and Defendant Larocca received at least $428,983.63 from Defendant Mott and/or the Entity Defendants as part of the Corrupt Enterprise.

179.    Upon information and belief, the Asset Holder Defendants agreed to receive, hold, conceal, move, dissipate and otherwise obfuscate, and did actually knowingly receive, hold, conceal, move, dissipate and otherwise obfuscate, the proceeds of the illegal check-kiting scheme

with the intention of furthering and facilitating the goals of the Corrupt Enterprise.

180.     The full scope of the Defendants' Corrupt Enterprise is not known, and the Defendant Mott's pattern of deceptiveness indicates that she may have perpetuated her scheme through additional entities and individuals not yet known.

181.     WHEREFORE Plaintiff respectfully requests that this Court enter a judgment against Defendants in an amount equal to three times the damages Plaintiff sustained pursuant to 18 U.S.C. 1965(c).

## COUNT IX
### (Aiding & Abetting Fraud – As Against the Asset Holder Defendants)

182.     Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

183.     As alleged in Count I above, Defendant Mott and the Entity Defendants perpetrated a fraud against Plaintiff by virtue of their fraudulent and illegal check-kiting scheme.

184.     The Asset Holder Defendants were aware of Defendant Mott and the Entity Defendants' fraud.

185.     The Asset Holder Defendants agreed to join in, and knowingly participated in the fraud by making an agreement to receive, and actually receiving, proceeds from Defendant Mott's illegal check-kiting scheme.

186.     The Asset Holder Defendants provided substantial assistance to Defendant Mott and the Entity Defendants in effecting the fraud by knowingly receiving, holding, moving, dissipating, hiding, disposing of, and otherwise concealing millions of dollars in ill-gotten gains Defendant Mott and the Entity Defendants obtained via the check-kiting scheme. Between December 2022 and February 2024, Defendant Bourne received at least $3,739,392.94 from Defendant Mott and/or the Entity Defendants as part of the Defendants' fraud; Defendant Pagano received at least $1,795,829.54 from Defendant Mott and/or the Entity Defendants as part of the

29035804.1

Defendants' fraud; Defendant Harris received at least $1,543,197.81 from Defendant Mott and/or the Entity Defendants as part of the Defendants' fraud; and Defendant Larocca received at least $428,983.63 from Defendant Mott and/or the Entity Defendants as part of the Defendants' fraud.

187.    WHEREFORE Plaintiff respectfully requests that this Court enter an Order in favor of Plaintiff and against the Asset Holder Defendants, jointly and severally, in the amount of $18,979,005.79, plus all accruing interest amounts through the date of judgment and thereafter at the maximum post-judgment interest rate permitted by law, plus all costs of collection (including, without limitation, reasonable attorneys' fees),

<u>COUNT X</u>
**(Money Had and Received – As Against the Asset Holder Defendants)**

188.    Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

189.    Between December 2022 and February 2024, Defendant Bourne received $3,739,392.94 belonging to the Plaintiff and benefitted from the receipt of said money.

190.    Between December 2022 and February 2024, Defendant Pagano received at least $1,795,829.54 belonging to the Plaintiff and benefitted from the receipt of said money.

191.    Between December 2022 and February 2024, Defendant Harris received at least $1,543,197.81 belonging to the Plaintiff and benefitted from the receipt of said money.

192.    Between December 2022 and February 2024, Defendant Larocca received at least $428,983.63 belonging to the Plaintiff and benefitted from the receipt of said money.

193.    In every instance, each of the Asset Holder Defendants was not entitled to receive the funds identified above and had no valid claim to those funds.

194.    Under the principles of equity and good conscience, the Asset Holder Defendants should not be permitted to keep the money they received as aforesaid.

195.    WHEREFORE Plaintiff respectfully requests that this Court enter an Order in favor

33

of Plaintiff and against the Asset Holder Defendants, jointly and severally, in the amount of $18,979,005.79, <u>plus</u> all accruing interest amounts through the date of judgment and thereafter at the maximum post-judgment interest rate permitted by law, <u>plus</u> all costs of collection (including, without limitation, reasonable attorneys' fees),

## DEMAND FOR TRIAL BY JURY

   Plaintiff demands a trial by jury on all issues that are so triable.

**Dated:** May 8, 2024      **BARCLAY DAMON LLP**

               By: *<u>/s/ David G. Burch, Jr.</u>*
                  David G. Burch, Jr.
                  Sarah A. O'Brien
                  Benjamin Zakarin

               *Attorneys for Plaintiffs*
               Office and Post Office Address
               100 Chestnut Street
               Rochester, New York 14604
               Telephone (315) 425-2716
               dburch@barclaydamon.com
               sobrien@barclaydamon.com
               bzakarin@barclaydamon.com

29035804.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 8, 2024, I served the foregoing document on all counsel of record via the Court's ECF system.

<u>*/s/ David Burch, Jr.*</u>
David G. Burch, Jr.

35