**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

FIVE STAR BANK,

*Plaintiff*,

v.

KATHERINE MOTT, ROBERT HARRIS;
KRM EVENTS, LLC; KATHERINE'S ON
MONROE, LLC; THE DIVINITY ESTATE
AND CHAPEL, LLC; KNC ELEGANCE,
LLC d/b/a THE WINTERGARDEN BY
MONROES; 11 WEXFORD GLEN, LLC;
RCC MONROES LLC; NAF REMODELING
LLC; MONROES AT RIDGEMONT LLC;
CRESCENT BEACH AT THE LAKE LLC;
MOTT MANAGEMENT LLC; KRISTINA
BOURNE; TAYLOR PAGANO; TIMOTHY
LAROCCA,

*Defendants.*

CASE NO. 6:24-cv-6153-FPG

CIVIL ACTION

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTION TO DISMISS FILED BY
DEFENDANT MOTT AND ALL ENTITY DEFENDANTS**

**BARCLAY DAMON LLP**
David G. Burch, Jr.
Sarah A. O'Brien
Benjamin R. Zakarin
*Attorneys for Plaintiff Five Star Bank*
One HSBC Plaza, 2000
100 Chestnut Street
Rochester, New York 14604
Telephone (315) 425 2716
dburch@barclaydamon.com
sobrien@barclaydamon.com
bzakarin@barclaydamon.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

POINT I. FIVE STAR HAS ADEQUATELY PLED THAT DEFENDANTS ENGAGED IN A
PATTERN OF RACKETEERING ACTIVITY NECESSARY TO STATE A CLAIM FOR
CIVIL RICO ................................................................................................................... 4

   a.   Five Star has sufficiently alleged closed-ended continuity ................................. 4

      i.   Defendants' scheme was well-established prior to 2022 ................................. 4

      ii.   The number of predicate acts, participants and victims ................................. 8

   b.   Five Star has sufficiently alleged open-ended continuity. ................................ 11

      i.   Regular Way of Conducting Business ......................................................... 13

      ii.   Continued Threat of Criminal Activity ........................................................ 16

POINT II. FIVE STAR HAS ADEQUATELY PLED A CLAIM FOR VIOLATION OF THE
RICO CONSPIRACY STATUTE ................................................................................. 18

POINT III. THE COURT SHOULD NOT DISMISS FIVE STAR'S STATE LAW CLAIMS;
EVEN IF THE COURT DISMISSES THE RICO CLAIMS, THE COURT SHOULD
EXERCISE ITS DISCRETION IN RETAINING SUPPLEMENTAL JURISDICTION .......... 22

CONCLUSION ............................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                               **Page(s)**

*Alkhatib v. New York Motor Grp., LLC*,
    2015 U.S. Dist. LEXIS 72055 (E.D.N.Y. 2015).....................................................................16

*Allstate Ins. Co. v. Valley Physical Med. & Rehab, PC*,
    2009 U.S. Dist. LEXIS 91291 (E.D.N.Y. 2009)...........................................................19, 22

*Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*,
    667 F. Supp. 3d 83 (S.D.N.Y. 2023)........................................................................5, 10

*Catzin v. Thank You & Good Luck Corp.*,
    899 F.3d 77 (2d Cir 2018)..............................................................................................23

*Chubb & Son Inc. v. Kelleher*,
    2010 U.S. Dist. LEXIS 141842 (E.D.N.Y. Oct. 22, 2010)................................19, 20

*City of New York v. Chavez*,
    944 F. Supp. 2d 260 (S.D.N.Y. 2013)...........................................................................19

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
    187 F.3d 229 (2d Cir. 1999)......................................................................................4, 11

*Dellefave v. Access Temps., Inc.*,
    37 F App'x 23 (2d Cir 2002).........................................................................................23

*Dreamco Dev. Corp. v. Empire State Dev. Corporation*,
    2017 U.S. Dist. LEXIS 156379 (W.D.N.Y. Sept. 25, 2017) .......................................10

*Elsevier Inc. v. Memon*,
    97 F. Supp. 3d 21 (E.D.N.Y. 2015) ..............................................................................12

*Environmental Servs. v. Recycle Green Servs.*,
    7 F. Supp. 3d 260 (E.D.N.Y. 2014) ..............................................................................19

*First Interregional Advisors Corp. v. Wolff*,
    956 F. Supp. 480 (S.D.N.Y. 1997) .............................................................................5, 6

*G-I Holdings v. Baron & Budd*,
    238 F. Supp. 2d 521 (S.D.N.Y. 2002).........................................................................12

*Grace Int'l Assembly of God v. Festa*,
    797 Fed. Appx. 603 (2d Cir. 2019)...............................................................................11

*Highmore Fin. Co. I LLC v. Greig Cos.*,
    2023 U.S. Dist. LEXIS 132037 (S.D.N.Y. July 31, 2023) ...........................................11

iii

*Hintergerger v. Catholic Health Sys.*,
    2012 US Dist LEXIS 37066 (W.D.N.Y. 2012) ...................................................................23

*Horn v. Med. Marijuana, Inc.*,
    2019 U.S. Dist. LEXIS 203290 (W.D.N.Y. 2019) ........................................................12, 16

*Lisa Coppola, LLC v. Higbee*,
    2020 U.S. Dist. LEXIS 41536 (W.D.N.Y. March 10, 2020) ....................................................7

*Martin Hilti Family v. Knoedler Gallery*,
    LLC, 386 F. Supp. 319 (S.D.N.Y 2019) ...............................................................................19

*Motorola Credit Corp. v. Uzan*,
    388 F.3d 39 (2d Cir 2004)....................................................................................................23

*Ozbakir v. Scotti*,
    764 F. Supp. 2d 556 (W.D.N.Y. 2011) ................................................................................10

*Reich v. Lopez*,
    858 F.3d 55 (2d Cir. 2017)...................................................................................................11

*SKS Constructors, Inc. v. Drinkwine*,
    458 F. Supp. 2d 68 (E.D.N.Y. 2006) .......................................................................4, 6, 12, 13

*Wells Fargo Century, Inc. v. Hanakis*,
    2005 U.S. Dist. LEXIS 17440 (E.D.N.Y. 2005).....................................................................5

## Statutes

18 U.S.C. 1964(c) .........................................................................................................................1

18 U.S.C. § 1962(d) ................................................................................................................18, 19

RICO ............................................................................................................................... *passim*

USA Patriot Act Section 314(b) ....................................................................................................9

## Other Authorities

Federal Rules 9(b) and 12(b)(6).....................................................................................................13

## <u>INTRODUCTION</u>

Plaintiff Five Star Bank ("Plaintiff" or "Five Star") respectfully submits this Memorandum of Law in opposition to the motion to dismiss filed by Defendant Katherine Mott-Formicola ("Defendant Mott"), the Entity Defendants[1] and Robert Harris[2] (collectively, the "Moving Defendants").

As this Court knows, this case has been pending for over five months. Defendant Mott has *still* not provided any explanation, clarifying information or any ostensible justification for the fraudulent scheme she perpetrated using bank accounts held in the names of the Defendant Entities, which resulted in over $18.9 million in damages to Five Star. Defendant Mott has also not provided any information or explanation for where the illegally obtained proceeds. Most importantly, neither Defendant Mott nor the Defendant Entities have restored a single penny to cover the checks written from accounts they maintain with Five Star that bounced in late February and early March. Five Star was able to exercise off-set rights, and the principal balance of monies owed is over $18.9 million.

Instead, just as they did in opposing Plaintiff's motion seeking the appointment of the Receiver, and in order to further stall discovery on the full extent of this criminal enterprise and a judgment in Five Star's favor, the Moving Defendants feebly and baldly assert that Plaintiff's RICO claim must be dismissed because the Amended Complaint fails to satisfy the "continuity"

---

[1] The "Entity Defendants" include KRM Events LLC, Katherine's on Monroe, LLC, The Divinity Estate and Chapel LLC, KNC Elegance LLC d/b/a The Wintergarden By Monroes, 11 Wexford Glen LLC, RCC Monroes LLC, NAF Remodeling, LLC, Monroes at Ridgemont LLC, Crescent Beach At the Lake LLC and Mott Management LLC.

[2] This Memorandum of Law addresses Defendant Robert Harris' motion to dismiss Five Star's claims for Fraud (Count I) and RICO (Count II). The remainder of Defendant Harris' motion to dismiss is addressed in Five Star's Omnibus Memorandum of Law submitted in Opposition to the motions to dismiss filed by the individual defendants Kristina Bourne, Taylor Pagano, Robert Harris, and Timothy LaRocca, which is expressly incorporated herein by reference.

requirement necessary to state a claim pursuant to 18 U.S.C. 1964(c). Specifically, Defendants claim that Plaintiff failed to plead "closed-ended" continuity because the banking relationship between Plaintiff and Defendant Mott only lasted approximately 16 months, which Defendants argue is below the two year predicate act time period threshold. Defendants separately argue that Plaintiff failed to plead "open-ended" continuity because Plaintiff's allegations that the predicate acts were the regular way Mott conducted her business and would have continued but for the commencement of this litigation, are "speculative."

Contrary to Defendants bald and self-serving assertions, Plaintiff has sufficiently alleged both closed-ended and open-ended continuity, and thus stated a plausible RICO claim. With regard to closed-ended continuity, Defendants fail to acknowledge that Plaintiff has pled facts, with sufficient particularity, that support the existence of an elaborate, broad, and complex check-kiting scheme that Defendants undertook to defraud Five Star and various other financial institutions for more than two years. As alleged in the Amended Complaint, Defendants were engaged in the check-kiting scheme as early as 2019, and that the scheme was a well-established practice by the time Mott began check-kiting at Five Star in 2022. Accordingly, the Amended Complaint sufficiently pleads the two year predicate act period Defendants concede would establish closed-ended continuity.

With regard to open-ended continuity, the Amended Complaint adequately pleads that Mott and the Entity Defendants used the illegal check-kiting scheme as an essential component of the regular way in which they conducted business. Specific allegations include hundreds of checks "ping-ponging" from Five Star and Kinecta Federal Credit Union on nearly a weekly basis and millions of dollars flowing out of Five Star into accounts affiliated with individuals related or employed by the Moving Defendants. In these instances, the criminal activity is deemed

continuous for purposes of open-ended continuity even if the business itself is primarily lawful. The key, which Five Star has done here, is pleading facts sufficient to support an inference that the predicate acts are the regular way in which the enterprise conducts its business.

Defendants argue that the RICO conspiracy claim (count VIII) should also be dismissed because the underlying RICO violation is insufficient and Plaintiff has not adequately alleged the existence of an agreement to commit the predicate acts. This argument simply ignores Plaintiff's detailed factual allegations, which must be accepted as true and afforded every possible favorable inference, concerning Defendants Bourne, Pagano, Harris and LaRocca's agreement to join, and knowingly participate in, the corrupt enterprise by making an agreement receive the proceeds of the Moving Defendants' check-kiting scheme.

Finally, Defendants make the argument that, upon dismissal of the RICO claim, the court should decline to exercise supplemental jurisdiction over the eight state law claims because the RICO claims are the only basis for federal subject matter jurisdiction. As fully set forth herein, the RICO claims are properly pled, but even if they are dismissed, the court has broad discretion in retaining jurisdiction over state law claims, and the principles of judicial economy, convenience to parties and witnesses, and fairness all weigh in favor of this court retaining jurisdiction.

The allegations in the Amended Complaint are sufficient to state claims for RICO and for a RICO conspiracy. This case should move forward to an Answer and discovery so that Plaintiff has a full and fair opportunity to pursue its well-plead claims and find the $18.9 million that it alleges Defendants stole through their criminal enterprise. For all these reasons, the Court should deny the Moving Defendants' motion to dismiss in its entirety.

## **ARGUMENT**

### **POINT I**

**FIVE STAR HAS ADEQUATELY PLED THAT DEFENDANTS
ENGAGED IN A PATTERN OF RACKETEERING ACTIVITY
NECESSARY TO STATE A CLAIM FOR CIVIL RICO**

### a. Five Star has sufficiently alleged closed-ended continuity.

#### i.    *Defendants' scheme was well-established prior to 2022*

In support of their motion to dismiss, the Moving Defendants assert that Five Star has failed to allege "closed-entity continuity" because the banking relationship between Five Star and the Moving Defendants began "at the earliest, in November of 2022" and "lasted at most through March 5, 2024, when plaintiff 'took steps to restrict [Defendant Mott's] ability to write further checks[.]" Dkt. No. 69, p. 8. Defendants baldly proclaim that this "16-month banking relationship" cannot support a finding of closed-ended continuity. Defendants' overly strict interpretation of closed-ended continuity is simply not accurate. As the cases discussed below demonstrate, courts often find the existence of closed-ended continuity despite a relationship or association lasting less than two years when there are facts from which it can be inferred that defendants' scheme was ongoing prior to the start of the parties' relationship. Defendants ignore the factual allegations in the Amended Complaint concerning Defendants' check-kiting and other financial misconduct that took place at other financial institutions before Defendant Mott opened up the various accounts at Five Star in 2022, which ultimately resulted in the closure of accounts held by the Moving Defendants at numerous other financial institutions.

A RICO plaintiff may satisfy the continuity element by a showing of "closed ended" continuity, which is shown by proving 'a series of related predicate acts extending over a substantial period of time.'" *SKS Constructors, Inc. v. Drinkwine,* 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006); *citing Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). Although courts generally use two years as an benchmark in determining whether

predicate acts have continued over a "substantial" period of time, courts may consider other factors, including "the number and variety of the predicate acts, the number of both participants and victims, and the presence of separate schemes [that] are also relevant in determining whether closed-ended continuity exists." *Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.,* 667 F. Supp. 3d 83, 135 (S.D.N.Y. 2023).

Predicate acts can be related for purposes of closed-ended continuity even if the predicate acts are committed against different victims. *Wells Fargo Century, Inc. v. Hanakis,* 2005 U.S. Dist. LEXIS 17440, at *14 (E.D.N.Y. 2005) (holding that the court should consider the acts alleged to have been committed against other non-party lenders as part of the same scheme because "if, as Defendant argues, only the acts involving Plaintiff can be considered in determining whether the scheme alleged was continuous, then schemes could remain in force, provided the orchestrators changed targets prior to the accrual of a 'substantial' period of time"); *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, (S.D.N.Y. 1997) (finding closed-ended continuity requirement was satisfied despite that scheme against plaintiff was only ongoing for a period of nine months because plaintiff alleged a scheme that defrauded not one but several lenders and was supported by numerous predicate acts that occurred over a period of almost fourteen months).

The defendant in *Wolff,* just like Defendants here, argued that, at most, plaintiffs alleged a "single scheme, with a single victim, extending over only a six month period," which did not threaten continued criminal activity. *Id.* at 486. There, the court did not agree with the defendants and held: "viewing the complaint in the light most favorable to [plaintiff] and drawing all reasonable inferences in its favor, I find that [plaintiff] has sufficiently alleged a 'closed period of repeated conduct' establishing a 'pattern of racketeering activity.' The court pointed to allegations concerning predicate acts plaintiff committed against other lenders in support of its finding. *Id.*

Accordingly, courts in this Circuit have consistently held that a plaintiff may allege the existence of predicate acts committed against others in support of allegations of an ongoing fraudulent scheme or pattern of racketeering activity.  *Id.*

Similarly, in *SKS Constructors, Inc.,* plaintiff company alleged in the complaint that it had "only a seventeen month period of association with [defendant]." Despite that the plaintiff and defendant's relationship was less than two years, the court still found that the plaintiff established the closed-ended continuity requirement for a RICO claim. In explaining its conclusion, the court held:

> The court also holds that Plaintiff has properly alleged closed-ended continuity. With respect to the Plaintiff company, there is alleged only a seventeen month period of association with [defendant]. Both the complaint and the papers submitted in response to the motion however, refer to a broader scheme. Thus, the complaint refers not only to the defrauding of the Plaintiff company, but to a larger scheme to defraud homeowners. The means employed by Defendants with respect to Plaintiff and other homeowners is the same. It is alleged that the Drinkwine Defendants were, and continue to be, engaged in a scheme defrauding homeowners by obtaining and receiving payment on home improvement contracts while never intending to complete any project.

Here, like the plaintiff in *SKS Constructors,* Five Star alleges facts sufficient to establish the existence of a broader check-kiting scheme, which Defendant Mott undertook to defraud various financial institutions in addition to Five Star. The Amended Complaint states that "Defendant Mott engaged in check-kiting at other financial institutions as early as 2019, well before Mott opened the various accounts at Five Star in late 2022 and early 2023." Dkt. No. 51, ¶ 33. Further, Five Star alleges that nearly immediately after Defendant Mott opened the first account at Five Star on December 9, 2022, she "continued the pattern and practice of kiting checks she had begun previously at her prior banking institutions and began a pattern and practice of 'rapidly moving funds' between Five Star and other financial institutions." *Id.* at ¶ 29. "Defendant

Mott engaged in this check-kiting activity—at Five Star and at various other financial institutions—as a regular way of operating her various businesses on behalf of the Entity Defendants."

As this Court knows, Plaintiff's motion for leave to serve expedited discovery upon six non-party financial institutions was denied (Dkt. No. 47), so Plaintiff has not been able to obtain detailed information related to the Defendants' illicit behavior and improper transaction history at these institutions. However, even without the benefit of discovery, Five Star has confirmed the following facts:

- Evans Bank closed accounts affiliated with Defendant Mott and the Entity Defendants in late 2022 for suspected check-kiting and check fraud activity in 2022. Dkt. No. 51, ¶ 34.

- Lyons National Bank closed accounts affiliated with Defendant Mott and the Entity Defendants in late 2022 due to suspected check-kiting. *Id.* at ¶ 35.

- Canandaigua Bank and Trust closed accounts affiliated with Defendant Mott and the Entity Defendants in 2022. *Id.* at ¶ 36.

- Tompkins Community Bank involuntarily closed accounts affiliated with Defendant Mott in 2019 due to inappropriate transaction history. *Id.* at ¶ 37.

At this stage of the litigation, Plaintiff's allegations—including those cited above involving Defendants' illegal conduct at other financial institutions, which began many months, and, in the case of Tompkins Community Bank, years before Defendant Mott opened up the first account at Five Star—must be accepted as true and all reasonable inferences must be drawn in favor of the plaintiff. *Lisa Coppola, LLC v. Higbee*, 2020 U.S. Dist. LEXIS 41536 at *18-19 (W.D.N.Y. March 10, 2020). Based upon the above-cited allegations, a reasonable inference can certainly be drawn that Defendants were engaged in the check-kiting scheme as early as 2019, and that the scheme

7

was a well-established practice by the time Mott began check-kiting at Five Star in 2022. Simply put, the allegation that Defendants' accounts at (*at least*) four different financial institutions were closed due to check-kiting and other financial misconduct before any accounts were opened at Five Star could lead a reasonable fact-finder to find closed-ended continuity.

<em>ii.</em>    <em>The number of predicate acts, participants and victims</em>

The other factors that the courts should consider when evaluating whether closed-ended continuity has been satisfied all weigh heavily in favor of Five Star. The sheer number of predicate acts committed by Defendant Mott and the various Entity Defendants is staggering. With regard to Five Star, the predicate acts "occurred nearly on a weekly basis from December 2022 through February 2024" (Dkt. No. 51, ¶ 38), and, by way of example illustrating the volume throughout the entire 16-month relationship, in a span of less than two weeks (between February 22, 2024 and March 5, 2024), Defendant Mott committed over 68 predicate acts by knowingly depositing 68 fraudulent checks into accounts held at Five Star in an aggregate amount exceeding $62 million. *Id.* at ¶¶ 45-53. Prior to becoming a customer of Five Star in 2022, the Moving Defendants were committing the same or related predicate acts at Evans Bank, Lyons National Bank. Canandaigua Bank and Trust, Tompkins Community Bank, and likely others, well before the Moving Defendants moved their accounts to Five Star. *Id.* at ¶¶ 33-37.

The number of participants and victims are also both substantial, and thus weigh in favor of a finding of closed-ended continuity. Defendant Mott utilized at least 10 entities (the Entity Defendants) and four individuals (Defendants Harris, Bourne, Pagano and LaRocca) as part of her complex, multi-faceted conspiracy and intentionally used complicated and unusual banking practices to create confusion and disguise her scheme. Mott and the Entity Defendants used the Asset Holder Defendants as mules to move these ill-gotten gains by issuing hundreds of cashier's

and counter checks to the Asset Holder Defendants written against the fraudulently-inflated account balances (in both the Entity Accounts and Mott's personal accounts), which totaled at least $7,507,403.92. *See* Dkt. No. 51 at ¶¶87-103.

Understanding that Plaintiff has adequately alleged the existence of Defendant Mott's broad, complex, and multi-faceted scheme to defraud Five Star and other financial institutions for well over two years, Defendants attempt to attack the veracity of the Amended Complaint's allegations concerning Mott's illegal conduct at other financial institutions. Defendants' employ a desperate and self-serving argument that the Court should "disregard plaintiff's conclusory and unsupported allegations" related to the other financial institutions because Plaintiff obtained this information via Section 314(b) of the USA Patriot Act.

To be clear, the information concerning Defendants' activity at other financial institutions was obtained in good faith throughout the course of Plaintiff and its counsel's investigation of the criminal misconduct by Defendants. Plaintiff has not disclosed any "confidential" information concerning Defendant Mott or any of the Entity Defendants in the Amended Complaint and no "communications" are referenced. All Plaintiff has done is state the facts—without disclosing any confidential or proprietary information whatsoever—that adequately allege Defendant Mott was engaged in check-kiting and other financial misconduct at other financial institutions *well before* she opened up the first account at Five Star in November 2022. Plaintiff will certainly obtain additional, more detailed information concerning these facts once it is permitted to serve discovery. The fact remains that, the allegations in the Amended Complaint, including that numerous financial institutions closed accounts affiliated with Defendant Mott for check-kiting, certainly support the inference that Defendant Mott was forced to move her accounts to Five Star so that

she could continue her illegal banking practices as a regular way of conducting her various businesses. Dkt. No. 51, ¶¶ 34-37.

Defendants cite no case, statute or other binding authority for the proposition that the factual allegations concerning Defendant Mott's financial misconduct at other financial institutions and the subsequent closure of her accounts, should not be considered by the Court. Instead, Defendants rely on an unpublished and unpersuasive article by a law firm located in Florida. Plaintiff expects to uncover additional details related to the predicate acts committed by Defendants at the other financial institutions once it is permitted to serve discovery, and these financial institutions will be required to provide additional details related to Mott's illegal conduct.[3]

The cases cited by Defendants on pages 8 and 9 of their Memorandum of Law in support of their argument that Five Star has failed to allege closed-ended continuity are all inapposite, as they all involved a single scheme, with few predicate acts, that was limited in duration. *See e.g., Ozbakir v. Scotti,* 764 F. Supp. 2d 556 (W.D.N.Y. 2011) (no RICO violation involving fraudulent scheme to induce plaintiffs to purchase commercial real property at an artificially inflated price that, at best, lasted one year and nine months; there were no allegations concerning other victims outside this period); *Dreamco Dev. Corp. v. Empire State Dev. Corporation,* 2017 U.S. Dist. LEXIS 156379 at \*7 (W.D.N.Y. Sept. 25, 2017) (no closed-ended continuity found where predicate acts lasted only four months and against single victim); *Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.,* 667 F. Supp. 3d 83, 135 (S.D.N.Y. 2023) ("Plaintiffs at most

---

[3] In the event this Court deems the allegations in the Amended Complaint related to Defendant Mott's illegal conduct at other financial institutions insufficient for purposes of establishing the RICO continuity requirement or otherwise disregards them in considering Defendants' motion to dismiss, it is respectfully submitted that Plaintiff should have the opportunity to serve limited discovery to obtain additional details related to Mott's illegal conduct and file a Second Amended Complaint.

allege a single scheme to deprive them of their money through Defendants' misrepresentations regarding the stability of the film financing investments and entering contracts they did not intend to honor."); *Highmore Fin. Co. I LLC v. Greig Cos.*, 2023 U.S. Dist. LEXIS 132037 (S.D.N.Y. July 31, 2023) (predicate acts lasting seven months insufficient to establish closed-ended continuity, and plaintiff did not allege a 'complex, multi-faceted conspiracy to defraud executed by numerous [parties]"); *Grace Int'l Assembly of God v. Festa*, 797 Fed. Appx. 603, (2d Cir. 2019) (no finding of pattern of racketeering because there was a single perpetrator and very few victims).

Based on the foregoing, Five Star has sufficiently alleged that Defendants engaged in a complex, multi-faceted conspiracy to defraud multiple victims, and has set forth facts involving a series of numerous RICO predicate acts extending over a substantial period of time, *i.e.,* from at least 2019 through March 2024 (and beyond). In sum, Five Star has therefore adequately pled facts establishing closed-ended continuity, and Defendants' motion to dismiss the RICO claims should be denied.

### b.  Five Star has sufficiently alleged open-ended continuity.

Defendants also argue that Five Star has failed to allege open-ended continuity, which exists "where the enterprise primarily conducts a legitimate business but there is some evidence from which it may be inferred that the predicate acts were the regular way of operating that business **_or_** that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Grace,* 797 F. App'x at 606. (emphasis added).

However, Five Star has separately pled open-ended continuity which serves as a separate basis to deny Defendants' motion to dismiss.

It is well settled in the Second Circuit that, in the context of open-ended continuity, "criminal activity is continuous when the predicate acts were the regular way of operating that

business, even if the business itself is primarily lawful." *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017) *citing Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 243 (2d Cir. 1999); (internal citations omitted); *see also SKS Constructors,* 458 F. Supp. 2d at 80 ("Where defendants are engaged in a legitimate business, open ended continuity can exist if the predicate acts are the regular way in which the enterprise conducts its business.").

Notably, it is not necessary to establish a continued threat of criminal activity if the plaintiff has sufficiently alleged that the predicate acts are the regular way in which the enterprise conducts its business. *See e.g., Horn v. Med. Marijuana, Inc.,* 2019 U.S. Dist. LEXIS 203290, at *12 (W.D.N.Y. 2019) ("Although the racketeering activity occurred during a circumscribed timeframe in 2012, there is sufficient evidence to conclude that Defendants' alleged acts of mail and wire fraud were 'the regular way of operating [the] business' even though the business itself was 'primarily lawful.'"); *Elsevier Inc. v. Memon*, 97 F. Supp. 3d 21, 31-32 (E.D.N.Y. 2015) (holding that plaintiffs sufficiently pleaded open-ended continuity because the plaintiffs alleged that the predicate acts of fraudulently purchasing discount subscriptions for resale to institutions was the regular means by which defendants' group operated); *SKS Constructors,* 458 F. Supp. at 79-80 (holding that although defendants "are engaged in the home improvement business, a business that is not criminal in nature, it is alleged that the predicate acts are the only way in which the business operated [. . .] While this may prove to be a difficult fact to establish at trial, it is sufficient to establish open-ended continuity for the purpose of this motion to dismiss"); *G-I Holdings v. Baron & Budd,* 238 F. Supp. 2d 521, 545 (S.D.N.Y. 2002) (holding that the RICO predicate acts committed by law firm paralegals, including falsifying over 200 affidavits in order to meet litigation deadlines, were part of the law firm's regular course of business and plaintiff therefore sufficiently alleged open-ended continuity).

As set forth above, *SKS Constructors* involves facts and issues very similar to those here. In *SKS Constructors,* the plaintiff home improvement company alleged that a former salesman defrauded and converted funds that should have been paid to the plaintiff company. *SKS Constructors,* 458 F. Supp. 2d at 73. In addition to asserting claims for fraud, conversion and tortious interference with contract, plaintiff asserted  RICO claims against the former salesperson, two other individual defendants (relatives of the former salesperson) who allegedly benefitted from the scheme, and four corporate defendants under the control of the former salesperson. *Id.* at 79. Defendants moved to dismiss pursuant to Federal Rules 9(b) and 12(b)(6). Plaintiff alleged that defendant wrongfully endorsed checks payable to plaintiff and then deposited those checks in to accounts for himself and the other defendants. The complaint set forth allegations that pre-dated the parties' business relationship as well as allegations concerning the parties' 17 month relationship. *Id.* at 74. Specific allegations included particular checks wrongfully endorsed and converted during the time in which plaintiff alleges that defendant acted as a salesperson. *Id.* In support of the RICO claims, plaintiff alleged that the defendants constituted an enterprise that engaged in a "scheme to defraud payments for construction projects which it did not intend to perform." *Id.*

### i.     *Regular Way of Conducting Business*

Here, just like in *SKS Constructors,* there are ample factual allegations set forth in the Amended Complaint that the predicate acts—*i.e.,* the numerous instances of check-kiting and transferring the proceeds to individuals—were the regular way that Defendant Mott operated her businesses. Dkt. No. 51, ¶ 39 ("Defendant Mott engaged in this check-kiting activity—at Five Star and at various other financial institutions—as a regular way of operating her various businesses on behalf of the Entity Defendants[.]").

For example, Five Star alleges that "the Entity Defendants' Five Star account records are replete with examples of 'check-kiting," and occurred nearly on a weekly basis from December 2022 through February 2024." In fact, Defendant Mott presented "in person at the Five Star branch, nearly on a daily basis, and instructing the Five Star teller working to issue her cashier's and/or counter checks for large sums." Dkt. No. 51, ¶ 40. By way of Plaintiff's allegations concerning the check-kiting at other financial institutions, including Evans Bank, Lyons National Bank, Canandaigua Bank and Trust and Tompkins Community Bank, and the subsequent closure of Defendants' accounts at those institutions (Dkt. No. 51, ¶¶ 33-37), it may be inferred that Defendant Mott was operating her businesses in this manner as early as 2019. *Id.* Moreover, Plaintiff alleges that "Defendant Mott was able to pull funds out of Five Star illegally by presenting in person at the Five Star branch, nearly on a daily basis, and instructing the Five Star teller working to issue her cashier's and/or counter checks for large sums." *Id.* at ¶ 40. These checks were often made payable to other individuals, including to Defendant Harris, Mott's husband, and Defendants Bourne, Pagano and LaRocca, all of whom are employed by Defendant Mott or one of her businesses. *Id.* at ¶ 41.

Five Star alleges that Defendant Bourne, an office manager at Monroe's Restaurant, one of the businesses owned and operated by Defendant Mott and/or the Entity Defendants, received over $3.7 million from Defendant Mott and/or the Entity Defendants within the span of 14 months, between December 2022 and February 2024. Dkt. No. 51, ¶¶ 89, 97.

Five Star also alleges that Defendant Pagano, an event coordinator at the Wintergarden by Monroe's and a manager at Monroe's Restaurant, both of which are establishments owned and operated by Defendant Mott and/or the Entity Defendants, received over $1.7 million from

Defendant Mott and/or the Entity Defendants within the span of 14 months, between December 2022 and February 2024. Dkt. No. 51, ¶¶ 90, 98.

Finally, Five Star alleges that Defendant LaRocca, who was previously employed as an executive chef at the Wintergarden by Monroe's, an establishment owned and operated by Defendant Mott and the Entity Defendants, received over $420,000.00 from Defendant Mott and/or the Entity Defendants within the span of 14 months, between December 2022 and February 2024. Dkt. No. 51, ¶¶ 92, 100.

Importantly, at this stage in the litigation, Five Star only has account statements for the period during which Defendant Mott held accounts at Five Star. Once Five Star is permitted to obtain discovery from other financial institutions, Five Star anticipates that it will be clear that Defendant Mott engaged in this purported "business practice" of allegedly reimbursing employees for millions of dollars in purported "business expenses" before opening up her accounts at Five Star. Again, to date, there has been no accounting for the over $18.9 million that was converted from the accounts maintained at Five Star and the Defendants have not restored any monies represented by the checks that bounced over four months ago.

Moreover, as the Receiver's Report dated June 5, 2024 (Dkt. No. 61) demonstrates, since the Defendants have been forced to stop illegally kiting checks at Five Star as a result of this litigation, the financial situation of the Entity Defendants' business has become incredibly dire. According to the Receiver, the Entity Defendants have "insufficient funds to meet current obligations," including payroll and sales taxes. Dkt. No. 61, ¶ 9, 11. Even more egregious, the Receiver himself had to advance monies from his own personal funds to honor the Entity Defendants' business obligations. *Id.* at ¶ 10. These facts, coupled with the allegations in the Amended Complaint, provide ample evidence from which a reasonable inference can be drawn

that Mott and the Entity Defendants relied upon the illegally obtained proceeds from the check-kiting scheme as a regular source of income to the businesses. What is more, the Receiver's Report states that the Entity Defendants had a "longstanding practice of covering vendor payments using personal credit cards." Dkt. No. 61, ¶ 10. It can thus be reasonably inferred that it was Mott and the Entity Defendants' regular way of conducting business to pay expenses using personal credit cards, and then use the illegal check-kiting proceeds to reimburse the individuals who fronted these expenses. Dkt. No. 51, ¶ 39.

ii.     *Continued Threat of Criminal Activity*

Although not required, Plaintiff has also sufficiently alleged a continued threat of criminal activity. When the illegal activity is part of the regular way of conducting the defendant's business as it is here, there is no "obvious ending point" to the scheme. *Horn v. Med. Marijuana,* 2019 U.S. Dist. LEXIS 203290 at *13 (holding that defendants' false advertising was a the regular way of promoting and selling their product and the fact that defendants' later updated their website does not eliminate open-ended continuity because "[w]hether predicate acts pose a threat of future conduct is evaluated as of the time the acts are committed.") *citing Alkhatib v. New York Motor Grp., LLC, 2015 U.S. Dist. LEXIS 72055,* at *20 (E.D.N.Y. 2015).

Although Five Star ultimately took steps to restrict the Defendants' bank accounts so as to ensure Defendants could not continue illegally kiting checks at its bank, at the time the Defendants were kiting, the predicate acts were part of the regular way that Defendant Mott operated her various businesses, and therefore posed a threat of continued criminal activity. As alleged in the Amended Complaint, Defendant Mott "gamed the system" by taking advantage of the delays inherent in bank check clearing and processing practices and associated funds availability policies by creating the impression of available funds by rapidly writing and depositing checks back and

forth between financial institutions. Dkt. No. 51, ¶ 31. Throughout the time Defendant Mott and the Entity Defendants were Five Star depositors, Mott continued engage in this illegal practice of "check kiting" by rapidly writing and depositing checks in person at the Five Star branch virtually on a daily basis. *Id.* at 32, ¶ 40.

At that point in time, Defendant Mott had a proven track record of engaging in this illegal behavior, and it is reasonable for this Court to infer that Defendant Mott's illegal conduct would have continued but for the commencement of this lawsuit. These allegations are not speculative; they are based on concrete facts concerning Defendant's prior pattern of moving from one financial institution to another after her accounts were closed for check-kiting. Indeed, Defendant Mott continued to kite checks after her accounts were closed at not one, not two, not three, but four other financial institutions (Dkt. No. 51, ¶¶ 33-37). She moved from institution to institution, continuing this practice as a regular part of her business, and, according to the Receiver's Report, her businesses depended on these illegal proceeds to operate.

Defendant Mott's conduct and express statements to Five Star personnel after Five Star learned of the enormous negative balances in Defendants' accounts also demonstrate that Defendant Mott would have continued the pattern of rapidly writing checks in and out of Five Star and other financial institutions but for the filing of this lawsuit and the appointment of the Receiver. Dkt. No. 51, ¶¶ 54-62. Specifically, the Amended Complaint alleges that "Five Star personnel had multiple daily calls with Defendant Mott between March 6 and March 8, 2024 regarding the negative balance. During that period of time, Defendant Mott falsely represented to Five Star that there must have been some type of 'book keeping error' and assured Five Star that she would immediately restore the monies owed." *Id.* at ¶ 55. Five Star also alleges that "Defendant Mott promised Five Star that she would make a $16 million dollar payment from Wells Fargo to apply

to the checks that bounced, despite knowing that she did not have sufficient funds to make such a payment." *Id.* at ¶ 56. Obviously, Defendant Mott never fulfilled these promises, and a reasonable inference can be drawn that Defendant Mott intended to continue her scheme at other financial institutions to "restore" the funds to Five Star in a classic example of "robbing Peter to pay Paul." Again, these allegations are not conjecture, they are rooted in fact and the court is permitted to make these reasonable inferences.

Although the Receiver now has control of the Entity Defendants' bank accounts, the Receiver has not been able to locate or otherwise trace the nearly $20 million in proceeds Defendants illegally obtained from the check-kiting scheme. A reasonable inference can be drawn that Defendant Mott and the other individual Defendants, including Harris, Bourne, Pagano and LaRocca, continue to hide, conceal or otherwise dissipate the illegal proceeds, thereby implying a continued threat of criminal activity.

## POINT II

## FIVE STAR HAS ADEQUATELY PLED A CLAIM
## FOR VIOLATION OF THE RICO CONSPIRACY STATUTE

Defendants argue that Plaintiff's claim for violation of the RICO conspiracy statute, 18 U.S.C. § 1962(d), should be dismissed because the underlying RICO claim is deficient. For all the reasons set forth in Point I above, Plaintiff has sufficiently stated a claim for RICO violations and this argument therefore fails.

Defendants also argue that the Amended Complaint does not contain sufficient allegations would support a "plausible" conclusion that the Defendants conspired to violate the RICO statute. This is argument also fails.

To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d), a plaintiff must prove: "(1) that there existed a conspiracy to commit acts that, if successful, would

constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner although not necessarily by the commission of any RICO predicate acts himself." *Martin Hilti Family v. Knoedler Gallery*, LLC, 386 F. Supp.  319, 240 (S.D.N.Y 2019); *City of New York v. Chavez*, 944 F. Supp. 2d 260, 268-69 (S.D.N.Y. 2013) ("To establish a violation of § 1962(d), a plaintiff must show that the defendant agreed with at least one other entity to commit a substantive RICO offense.")

Significantly, it is not necessary to find that each defendant knew all the details or the full extent of the conspiracy, including the identity and role of every other conspirator. *Environmental Servs. v. Recycle Green Servs.*, 7 F. Supp. 3d 260, 275 (E.D.N.Y. 2014) ("All that is necessary to prove this element of the RICO conspiracy, against a particular defendant, is to prove that he or she agreed with one or more co-conspirators to participate in the conspiracy. Moreover, it is not necessary for the conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities and persons involved.") *citing Chubb & Son Inc. v. Kelleher*, 2010 U.S. Dist. LEXIS 141842, at *4 (E.D.N.Y. Oct. 22, 2010).

It is well settled that "a conspirator need not be fully informed about his co-conspirators specific criminal acts provided that he agreed to participate in the broader criminal conspiracy and the acts evincing participation were not outside the scope of the illegal agreement." *Allstate Ins. Co. v. Valley Physical Med. & Rehab, PC*,  2009 U.S. Dist. LEXIS 91291, at *21 (E.D.N.Y. 2009).

Here, Five Star has plausibly alleged a RICO conspiracy between the Defendants. Five Star alleges that Defendants Harris, Bourne, Pagano and LaRocca (collectively referred to as the "Asset Holder Defendants") agreed to join, and knowingly participated in, the corrupt enterprise by making an agreement to receive the proceeds of the Moving Defendants' check-kiting scheme.

Dkt. No. 51, ¶ 88, 176. The Amended Complaint alleges with significant particularity each Asset Holder Defendants' specific and unique connection to Mott and her businesses, details their agreement to participate in the corrupt enterprise, and explains that Defendant Mott utilized these individuals as "mules" to move, hide or otherwise dissipate the funds obtained via the illegal check-kiting scheme. Specifically, Five Star alleges the following:

- Defendant Bourne, an office manager at Monroe's Restaurant, one of the businesses owned and operated by Defendant Mott and/or the Entity Defendants, received over $3.7 million from Defendant Mott and/or the Entity Defendants between December 2022 and February 2024. Dkt. No. 51, ¶¶ 89, 97.

- Defendant Pagano, an event coordinator at the Wintergarden by Monroe's and a manager at Monroe's Restaurant, both of which are establishments owned and operated by Defendant Mott and/or the Entity Defendants, received over $1.7 million from Defendant Mott and/or the Entity Defendants between December 2022 and February 2024. Dkt. No. 51, ¶¶ 90, 98.

- Defendant Harris, Mott's husband, received over $1.5 million from Defendant Mott and/or the Entity Defendants between December 2022 and February 2024. Dkt. No. 51, ¶¶ 91, 99

- Defendant LaRocca, who was previously employed as an executive chef at the Wintergarden by Monroe's, an establishment owned and operated by Defendant Mott and the Entity Defendants, received over $420,000.00 from Defendant Mott and/or the Entity Defendants between December 2022 and February 2024. Dkt. No. 51, ¶¶ 92, 100.

As set forth above, a plaintiff does not need to allege—much less *prove*—that the conspiratorial agreement was express, so long as the existence of the agreement can "plausibly be inferred." *Chubb*, 2010 U.S. Dist. LEXIS 141842, at *4.  At this stage, the allegations against the Asset Holder Defendants *must* be accepted as true, and Five Star is afforded the benefit of every possible favorable inference resulting therefrom. Here, it can certainly be inferred that Defendants Bourne, Pagano, Harris and LaRocca agreed to participate in the check-kiting scheme by accepting such unusually large individual and cumulative sums money over a short period of time. It strains credulity for the Moving Defendants to argue that Bourne, Pagano, Harris and LaRocca were ignorant as to the scheme or that the checks they were receiving—***checks that oftentimes exceeded hundreds of thousands of dollars in a single month*** (Dkt. No. 51, ¶¶ 97-100)—were derived from legitimate business activity.

Each of these checks, numbering over 400 in total, were deposited by each of the Asset Holder Defendant into an account over which they exercised at least partial control.  *See* Dkt. No. No. 51-3, 51-4, 51-5, and 51-6. Given that each of the Asset Holders had a close connection to Mott (Harris is married to Mott, and Bourne, Pagano and LaRocca, all were employed by Mott and/or one of her businesses), it can be inferred that the Asset Holder Defendants understood that Mott's businesses were not generating that level of revenue or racking up those levels of expenses It necessarily follows that all, if not the overwhelming majority, of the significant sums Mott paid to Bourne, Pagano, Harris and LaRocca ($3.7 million, $1.7 million, $1.5 million and $420,000 respectively) were wrongfully obtained directly through Defendant Mott and the Entity Defendants' long-term check-kiting scheme.  In one particularly clear example, Defendant Pagano received and deposited a check for $14,000.00 on February 23, 2024 from KRM Events LLC— the very day on which Mott's scheme began to unravel.

Five Star certainly sufficiently pleads facts to support that the Asset Holder Defendants all know that the funds were illegally obtained, and agreed to accept, and did actually accept these illegally obtained funds. Under the case law, these facts, which must be accepted as true, are enough at the pleading stage to state a claim for RICO conspiracy. *Allstate Ins. Co.*, 2009 U.S. Dist. LEXIS 91291("a conspirator need not be fully informed about his co-conspirators specific criminal acts provided that he agreed to participate in the broader criminal conspiracy and the acts evincing participation were not outside the scope of the illegal agreement.").

The Amended Complaint also alleges that Five Star, through counsel, demanded that the Asset Holder Defendants return the illegally obtained funds or, alternatively, provide an explanation of the valid business purpose(s) for which these payments were made. Dkt. No. 51, ¶ 102. The Asset Holder Defendants have neither returned any funds nor provided a legitimate explanation for why Defendant Mott and the Entity Defendants made these payments to each of them, which only further evinces the existence of the conspiracy.

## POINT III

**THE COURT SHOULD NOT DISMISS FIVE STAR'S STATE LAW CLAIMS; EVEN IF THE COURT DISMISSES THE RICO CLAIMS, THE COURT SHOULD EXERCISE ITS DISCRETION IN RETAINING SUPPLEMENTAL JURISDICTION**

Defendants argue that because the civil RICO claim should be dismissed, the Court should decline to exercise supplemental jurisdiction over Five Star's eight state law claims. As fully set forth in Point I, Plaintiff has properly pled its RICO claim, so there is no reason for the Court to dismiss the state law claims for fraud (count I), breach of contract (count III), unjust enrichment (count IV), conversion (count V), collection on debt (count VI), indemnification (count VII), aiding and abetting fraud (count IX) and money had and received (count X).

However, in the event this Court determines that Plaintiff has failed to state a plausible RICO claim against Defendants, this Court should exercise its discretion in retaining supplemental jurisdiction over the eight state law claims because the "principles of judicial economy, convenience to parties and witnesses, and fairness all weigh in favor of retaining jurisdiction." *Hintergerger v. Catholic Health Sys.*, 2012 US Dist LEXIS 37066 (W.D.N.Y. 2012); *see also Dellefave v. Access Temps., Inc.*, 37 F App'x 23 (2d Cir 2002) (holding that district court did not abuse its discretion in exercising supplemental jurisdiction because the state claims did not involve novel or unsettled questions of law, and judicial economy was served because the court had the case for over a year and resolved several motions); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir 2004) (finding exercise of supplemental jurisdiction was proper because significant judicial resources were expended, findings of fact were made, and "it would have stood judicial economy on its head not to procesed with the state claims after our remand.").

The Moving Defendants have failed to articulate how judicial economy, convenience, fairness, or comity might be served by requiring the parties to expend additional time and money re-litigating the same issues in state court. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77 (2d Cir 2018). Although this case is at the motion to dismiss stage, significant resources have already been expended by both parties, the court and the court-appointed Receiver in connection with this action. This court has decided numerous substantive motions, including the Plaintiff's motion to appoint a Receiver (Dkt. No. 3), Plaintiff's motion to serve expedited discovery (Dkt. No. 34),  (and the related motions to expedited the hearings on those motions) as well as Defendants' motion to compel compliance with the Receiver order (Dkt. No. 50), the Receiver's motion for approval to retain counsel (Dkt. No. 39), and now, the various motions to dismiss the Amended Complaint filed by Defendants (ECF Nos. 69, 74, 75, 78, 80). The facts forming the

basis of this case are complex, and this Court has already expended significant resources becoming familiar with them. As evidenced by the Receiver's Report (Dkt. No. 61), the Receiver has also spent significant time and money reviewing Defendants' finances and obtaining custody of the same.  Moreover, Plaintiff is certainly likely to succeed on the merits of its state law claims on summary judgment, as Defendants have no viable defenses. Based on the foregoing, principles of judicial economy, convenience to parties and witnesses, and fairness all weigh in favor of this Court exercising its discretion to retain jurisdiction over the state law claims, even in the absence of the federal RICO claim.

**<u>CONCLUSION</u>**

For all the reasons set forth herein, it is respectfully requested that the Court deny the Moving Defendants' motion to dismiss in its entirety, and grant such other and further relief it deems just and proper.

**Dated:** August 12, 2024

> Respectfully submitted,
> **BARCLAY DAMON LLP**
>
> By: */s/ David G. Burch, Jr.*
> David G. Burch, Esq.
> Sarah A. O'Brien, Esq.
> Benjamin R. Zakarin, Esq.
> One HSBC Plaza
> 100 Chestnut Street
> Rochester, New York 14604
> (585) 295-4400
> dburch@barclaydamon.com
> sobrien@barclaydamon.com
> bzakarin@barclaydamon.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 12, 2024, I served the foregoing document on all counsel of record via the Court's ECF system.


_____

David G. Burch, Jr.