**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIVE STAR BANK, | |
| *Plaintiff*, | CASE NO. 6:24-cv-06153 |
| v. | |
| KATHERINE MOTT, ROBERT HARRIS; KRM EVENTS, LLC; KATHERINE'S ON MONROE, LLC; THE DIVINITY ESTATE AND CHAPEL, LLC; KNC ELEGANCE, LLC d/b/a THE WINTERGARDEN BY MONROES; 11 WEXFORD GLEN, LLC; RCC MONROES LLC; NAF REMODELING LLC; MONROES AT RIDGEMONT LLC; CRESCENT BEACH AT THE LAKE LLC; MOTT MANAGEMENT LLC;  KRISTINA BOURNE; TAYLOR PAGANO; TIMOTHY LAROCCA, | CIVIL ACTION |
| *Defendants*. | |

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN ORDER OF ATTACHMENT AS TO ALL DEFENDANTS**</u>

**BARCLAY DAMON LLP**

David G. Burch, Jr.
Sarah A. O'Brien
Benjamin R. Zakarin
One HSBC Plaza, 2000
100 Chestnut Street
Rochester, New York 14604
Telephone (315) 425-2716
dburch@barclaydamon.com
sobrien@barclaydamon.com
bzakarin@barclaydamon.com
*Attorneys for Plaintiff Five Star Bank*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 2

   Mott and the Entity Defendants Commenced the Corrupt Enterprise ...................................... 2

   The Other Individual Defendants' Participation in the Corrupt Enterprise .............................. 4

     Defendant Bourne ........................................................................................... 5

     Defendant Pagano ........................................................................................... 5

     Defendant Larocca .......................................................................................... 5

     Defendant Harris ............................................................................................ 6

PROCEDURAL HISTORY ..................................................................................... 6

ARGUMENT ....................................................................................................... 7

   **AN ORDER OF ATTACHMENT SHOULD ISSUE** ............................................... **8**

     **A.**  **Plaintiff's Claims are For Money Damages** ................................................ 9

     **B.**  **Plaintiff is Likely to Succeed on the Merits** ............................................ 10

       1.   Defendant Mott and the Entity Defendants ........................................... 10

       2.   The Asset Holder Defendants ................................................................ 12

         i.   Defendants Received Money Belonging to Plaintiff ............ **Error! Bookmark not defined.**

         ii.   Defendants Benefited from Receiving the Funds **Error! Bookmark not defined.**

         iii.   Equity and Good Conscience Require Restitution ............. **Error! Bookmark not defined.**

     **C.**  **Attachment is Proper Based on Defendants' Fraudulent Conduct** ....................... 17

     **D.**  **Plaintiff's Demand Exceeds All Known Counterclaims** ........................................ 18

29466885.1

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                 **Page(s)**

*Allstate Ins. Co. v. Levy*,
   478 Fed. Appx. 688 (2d Cir. 2012) ..........................................................................................8

*Bank Leumi Trust Co. v. Istim, Inc.*,
   892 F. Supp. 478 (S.D.N.Y. 1995) .........................................................................................17

*Bank of Am., N.A. v. Fischer*,
   927 F. Supp. 2d 15 (E.D.N.Y. 2013) .....................................................................................16

*Bank of China v NBM L.L.C.*,
   192 F Supp 2d 183 (S.D.N.Y. 2002) ........................................................................................8

*City of New York v. CitiSource, Inc.*,
   679 F. Supp. 393 (S.D.N.Y. 1988) .........................................................................................17

*Crigger v. Fahnestock & Co.*,
   443 F.3d 230 (2d Cir. 2006) ...................................................................................................10

*DLJ Mortg. Capital, Inc. v. Kontogiannis*,
   594 F. Supp. 2d 308 (E.D.N.Y. 2009) .....................................................................................9

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995) .....................................................................................................16

*Lippe v. Bairnco Corp.*,
   249 F. Supp. 2d 357 (S.D.N.Y. 2003) ....................................................................................16

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir 2015) ....................................................................................................10

*Marini v. Adamo*,
   995 F. Supp. 2d 155 (E.D.N.Y. 2014) ....................................................................................11

*Monteleone v. Leverage Group*,
   2008 U.S. Dist. LEXIS 78983, 2008 WL 4541124 (E.D.N.Y. Oct. 7, 2008) ..........................10

*Moreno-Godoy v. Kartagener*,
   7 F.4th 78 (2d Cir. 2021) ........................................................................................................14

*Robert Smalls Inc., v. Hamilton*,
   2010 U.S. Dist. LEXIS 83643 (S.D.N.Y. July 19, 2010) .......................................................14

*Societe Generale v. Flemingdon Dev. Corp.*,
   118 A.D.2d 768 (2d. Dep't 1986) ...........................................................................................16

29466885.1

*U.S. SBA As Receiver of Elk Assocs. Funding Corp. v. Ameritrans Holding, LLC*,
    2024 U.S. Dist. LEXIS 29702 (E.D.N.Y. Feb. 21, 2024)........................................................11

**Statutes**

CPLR § 6201.................................................................................................1, 2, 3, 8, 15

CPLR § 6212.........................................................................................................8, 17

RICO ...........................................................................................................................7

**Other Authorities**

available at: https://rbj.net/2024/06/12/receiver-mott-venues-in-precarious-
    position-contractor-files-lien-foreclosure-notice/ ................................................................7, 9

Federal Rule of Civil Procedure 64 ..............................................................1, 2, 8, 17

OFFICE OF THE COMPTROLLER OF THE CURRENCY, Advisory Letter AL-96-6..............................13

ROCHESTER BUSINESS JOURNAL, June 12, 2024 ........................................................7, 9

This memorandum of law is submitted on behalf of Plaintiff, Five Star Bank (the "Bank," "Plaintiff," or "FSB") in support of its motion for an order of attachment pursuant to Federal Rule of Civil Procedure 64 and New York CPLR 6201.

### PRELIMINARY STATEMENT

Plaintiff brought this action to recover a principal sum of $18,979,005.79, plus all accruing pre-judgment and post-judgment interest and all costs of collection (including reasonable attorney's fees) due and owing to the Bank in connection with the defendants' orchestration and participation in a vast check-kiting scheme. *See* ECF No. 51 (Amended Complaint). Plaintiff now moves for an order of attachment against the property of each of the individual and entity defendants in order to secure the judgment that will inevitably result from this action.

While the flow of money through a web of individuals and sham corporations described below is convoluted, the facts of this case are simple: Defendant Katherine Mott ("Mott"), using her own bank accounts and the bank accounts of a web of corporate entities she controls, [1] all held at Five Star Bank, orchestrated a check-kiting scheme over several years whereby she artificially inflated those accounts' balances by repeatedly and systematically depositing high dollar amount checks into the accounts she controlled at the Bank despite never having sufficient funds to honor those checks. By rapidly writing and depositing these checks, Defendant Mott created the perception that her accounts had funds available while never actually having such funds, specifically by taking advantage of the inherent gap in the Bank's reconciliation of deposits (and the Bank's practice of honoring certain commercial-tier clients' checks on the basis of uncollected

---

[1] The defendant entities are: KRM Events, LLC; Katherine's on Monroe, LLC; The Divinity Estate and Chapel, LLC; KNC Elegance, LLC d/b/a The Wintergarden by Monroes; 11 Wexford Glen, LLC; RCC Monroes LLC; NAF Remodeling LLC; Monroes at Ridgemont LLC; Crescent Beach at the Lake LLC; and Mott Management LLC (collectively, the "Entity Defendants").

1

balances).  Mott and the other defendants exploited this delay in account balance reconciliation to dissipate these temporary, albeit non-existent, account balances in the Entity Defendants' accounts by funneling these temporarily-credited funds from those accounts out of the Bank through hundreds of checks, checks totaling at least $7,507,403.92, that were issued to individual defendants Harris, Bourne, Pagano and LaRocca.  Defendants Harris, Bourne, Pagano, and Larocca deposited those fraudulently-issued checks into bank accounts under their control, and the subsequent disposition or use of those funds remains unknown to Plaintiff at this time.

Given the duration of Defendants' misconduct, the amounts involved, as well as each of the defendants' involvement in the wrongful dissipation and secreting of funds rightfully belonging to the Bank, it is reasonably certain that if an order of attachment is not issued, any judgment that will result from this action will be worthless.  Accordingly, and as set forth below, Plaintiff respectfully submits that the Court should issue an order of attachment as to the assets of each of the defendants pursuant to Fed. R. Civ. P. 64 and New York CPLR 6201(3).

## FACTUAL BACKGROUND

### Mott and the Entity Defendants Commenced the Corrupt Enterprise

Between November 2022 and January 2024,[2] Mott opened at least one bank account, and in many instances several bank accounts, in the name of each of the Entity Defendants at Five Star Bank (the "Entity Accounts"). (ECF No. 31 at ¶ 8).  On or about December 15, 2022, Mott initiated her check-kiting scheme at the Bank in concert with the other individual defendants and utilizing the Entity Accounts.  *Id.* at ¶ 9.  In a typical kiting transaction, Mott would write a check on accounts in the Entity Defendants' name at Kinecta Federal Credit Union ("Kinecta FCU") for

---

[2] To be clear, Defendants' Corrupt Enterprise predates the opening of Mott's account and the Entity Accounts at FSB, extending as far back as 2019.  *See* ECF No. 51 at ¶ 37.

which insufficient funds existed and deposit that check into an account controlled by an Entity Defendant held at FSB.  By taking advantage of the delay inherent in bank reconciliation of deposits (and the widespread practice of honoring checks on the basis of uncollected balances), Mott and the Entity Defendants were able to temporarily inflate the cash balance in the Entity Defendants' accounts at FSB to create the appearance of additional cash in the FSB accounts, despite insufficient funds to honor the check in the originating accounts at Kinecta FCU.  *Id.*  As a result, transfers and checks written from the Entity Defendants' FSB accounts that otherwise would have been refused or returned were made and honored by FSB to its detriment.

As set forth in the Affidavit of Michael Jozwiak (ECF No. 31), the Bank's ongoing review of the relevant bank records show that Defendant Mott was engaged in this scheme to artificially inflate the Entity Account balances and her personal account balances throughout the banking relationship.  ECF No. 31 at ¶ 11.  The Jozwiak Affidavit identified, merely by way of example, confirmed instances of check-kiting in December 2022, February 2023, May 2023, September 2023, and January 2024.  *Id.*  Moreover, as stated in the Jozwiak Affidavit, neither Mott nor the Entity Defendants ever had funds sufficient to cover the checks being written against Mott's personal accounts or the Entity Accounts.  In fact, the highest combined total account balance as between Mott and the Entity Defendants never exceeded more than $7 million.  *Id.* at ¶ 22.  Thus, while the final toll of Mott's check-kiting scheme was not clear until the last of her fraudulent checks had been charged back by Kinecta FCU on March 5, 2024, *i.e.* when the "music stopped," on Mott and the Entity Defendants' active check-kiting at the Bank (*see* ECF No. 36 at 3-4), there is little question that as a result of this longstanding Corrupt Enterprise, the Bank was being wrongfully deprived of funds by Mott and the Entity Defendants from December 2022 through February 2024.

**The Other Individual Defendants' Participation in the Corrupt Enterprise**

To actually realize the fruits of her fraudulent scheme, Mott needed a means to withdraw funds from the artificially-inflated accounts and to ensure these ill-gotten gains were not clawed back by the Bank upon discovery of her misconduct and readjustment of those account balances to eliminate the fraudulent deposits. Thus, Mott enlisted the Individual Defendants to join her Corrupt Enterprise and further its purposes by receiving and dissipating millions of dollars rightfully belonging to the Bank from December 2022 through February 2024. Both Defendants Pagano and Bourne are currently employed by one or more of the Defendant Entities, while Defendant Larocca was previously employed by one of the Defendant Entities.[3] Defendant Harris is married to Mott.

During December 2022 through February 2024, Defendants Harris, Bourne, Pagano, and Larocca (collectively, the "Asset Holder Defendants") conspired and played an integral role in the Corrupt Enterprise alleged in Plaintiff's Amended Complaint. Specifically, each of the Asset Holder Defendants conspired to further the Corrupt Enterprise, and, in fact did aid and abet the Corrupt Enterprise by receiving the proceeds of the check-kiting scheme and acting as conduits for the dissipation, secretion, and/or concealment of at least $7,507,403.92 (the "Asset Holder Funds") in ill-gotten gains by depositing hundreds of fraudulently-obtained cashier's checks or counter checks drawn on Mott's FSB accounts or the Entity Accounts at the direction of Defendant Mott. (ECF. No. 51).

---

[3] At the time of filing the Amended Complaint, Defendant Bourne was an office manager at Monroe's Restaurant, the business associated with one of the Entity Defendants and run by Defendant Mott. Defendant Pagano was an event coordinator at the Wintergarden by Monroe's and a manager at Monroe's Restaurants, both businesses associated with two distinct Entity Defendants and run by Defendant Mott. Larocca was previously employed as Executive Chef at the Wintergarden by Monroe's. *See* ECF No. 51 at ¶ 89-92.

<u>Defendant Bourne</u>

In particular, between December 2022 and January 2024, Defendant Mott and the Entity Defendants issued some 189 checks to Defendant Bourne and drawn on various accounts at FSB controlled by Mott totaling at least $3,739,392.94. (ECF No. 51 at ¶ 97).  Each of these checks was funded by the proceeds of the Corrupt Enterprise and was deposited into an account controlled by or in Bourne's name.  To disguise this deluge of illegal funds, Mott caused 179 of those checks to be issued with comments referencing "Capital One Reimbursement," "Amex Reimbursement," "Chase Reimbursement," or a more generic "Credit Card Reimbursement." *See* ECF No. 51-3.

<u>Defendant Pagano</u>

Likewise, between December 2022 and January 2024, Defendant Pagano received and deposited at least 116 checks written from Defendant Mott's FSB accounts or the Entity Accounts totaling at least $1,795,829.54.  (ECF No. 51 at ¶ 98).  Each of these checks, funded by the proceeds of the Corrupt Enterprise, was deposited into an account controlled by or in Pagano's name.  Again, Mott attempted to conceal the purpose of these transactions by causing 86 of those checks to be issued with comments referencing, *inter alia*, "credit card reimbursement" or "Capital One."  *See* ECF No. 51-4.

<u>Defendant Larocca</u>

Between December 2022 and December 2023, Defendant Mott and the Entity Defendants issued Defendant Larocca some 26 checks totaling $428,983.63 written from Mott's FSB accounts or the Entity Accounts.  (ECF No. 51 at ¶ 100). Each of these checks, funded by the proceeds of the Corrupt Enterprise, was deposited into an account controlled by or in Larocca's name.  Mott attempted to conceal the true purpose of those checks, the dissipation of the Corrupt Enterprise's ill-gotten gains, by causing all but one of those 26 checks to be issued with comments referring to

a "credit card reimbursement," a "Discover reimbursement," or "Capital One reimbursement."  *See* ECF No. 51-6.

      <u>Defendant Harris</u>

Finally, between December 2022 and November 2023, Defendant Mott issued or caused to be issued some 67 checks totaling $1,543,197.81 from her accounts at FSB or the Entity Accounts to her husband, Defendant Harris. (ECF No. 51 at ¶ 99). Each of these checks, funded by the proceeds of the Corrupt Enterprise, was deposited into an account controlled by Harris or in Harris's name.  As with the other Asset Holder Defendants, Mott attempted to conceal the true purpose of those checks by causing them to be issued with reference to reimbursement for various expense, including "AMEX" and "Credit Card Reimbursement."  *See* ECF No. 51-5.

To date, the Asset Holder Defendants have refused FSB's demands to return these illegally-obtained funds or to provide a legitimate explanation for these substantial payments.

## PROCEDURAL HISTORY

On March 11, 2024, Plaintiff filed its initial complaint against Defendant Mott and the Entity Defendants alleging, *inter alia*, Racketeer Influenced Corrupt Organizations Act ("RICO") violations, unjust enrichment, common law fraud, and seeking indemnification.  (ECF No. 1). Also on March 11, 2024, Plaintiff filed a contested motion to appoint a receiver to manage the financial affairs of the Entity Defendants.  (ECF No. 3).  After granting Plaintiff's motion for expedited proceedings (ECF No. 10), the Court heard oral argument on Plaintiff's motion to appoint a receiver on April 3, 2024.  On April 4, 2024, the Court issued a Decision and Order granting Plaintiff's motion to appoint a receiver to manage the financial affairs and assets of the Entity Defendants. (ECF No. 36).

On May 8th, the Court entered an Order naming Mark R. Kercher, CPA as Receiver for the Entity Defendants.  (ECF No. 39).  Pursuant to that Order, Mr. Kercher was granted, *inter alia*, exclusive dominion and control over the financial affairs of all of the Entity Defendants, possession of the Entity Defendants' bank and financial accounts, to make payments in the ordinary course of business, authority to perform an accounting of the Entity Defendants' assets, and to preserve their revenue streams.  (*Id.* at 2). That same day, based on newly-discovered evidence, Plaintiff filed the operative Amended Complaint, which added the Asset Holder Defendants included claims for RICO Conspiracy and aiding and abetting fraud against them.  (ECF No. 51).

Thus, while the Receiver is currently engaged in the process of sustaining and normalizing the Entity Defendants' financial affairs, the Bank has not yet received any of the funds obtained through the Corrupt Enterprise, leaving only the conclusion that they continue to be retained by the Defendants.  As such, there is presently no order that will ensure that the substantial and wrongfully-obtained funds dissipated through the Asset Holder Defendants and, as alleged, returned at least in part to Mott thereafter by the Asset Holder Defendants, will ever be returned to the Bank.[4]

## **ARGUMENT**

### **Legal Standard**

Pursuant to Fed. R. Civ. P. 64, New York state law governs this motion for orders of attachment.  CPLR 6212(a) provides that an order of attachment may issue where the movant

---

[4] Moreover, the Entity Defendants increasingly-tenuous circumstances mean that even if the funds are recovered, the emergence of other creditors further jeopardizes the Bank's ability to recover from Defendants.  *See, e.g.,*  Kevin Oklobzija, "Receiver: Mott venues in 'precarious' position; contractor files lien foreclosure notice," ROCHESTER BUSINESS JOURNAL, June 12, 2024 (available at:   https://rbj.net/2024/06/12/receiver-mott-venues-in-precarious-position-contractor-files-lien-foreclosure-notice/ (noting that among other difficulties, a contractor filed a lien of foreclosure on property owned by 11 Wexford Glen, LLC for nonpayment of $541,852.11 due and owing).

successfully demonstrates: (1) there is a cause of action for money damages; (2) that it is likely to succeed on the merits of its action; (3) one or more grounds for attachment under CPLR 6201 exist; and (4) the amount demanded exceeds all known counterclaims.  *See Bank of China v NBM L.L.C.*, 192 F Supp 2d 183, 187 (S.D.N.Y. 2002); CPLR 6212(a).  As relevant here, CPLR 6201(3) provides that an order of attachment may be granted where the defendant, with intent to defraud her creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property.  CPLR 6201(3); *see also Allstate Ins. Co. v. Levy*, 478 Fed. Appx. 688, 690 (2d Cir. 2012).  In assessing whether the non-movant has satisfied CPLR 6201(3), "courts may consider evidence of the defendant's fraudulent conduct predating the initiation of suit by the plaintiff." *Allstate*, 478 Fed. App. at 690 (*citing N.Y. Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.*, 2008 U.S. Dist. LEXIS 40517 (S.D.N.Y. May 16, 2008)).

## AN ORDER OF ATTACHMENT SHOULD ISSUE

Plaintiff has demonstrated each of the four enumerated elements necessary to issue an order of attachment under New York law.  In fact, such a determination would be justified with respect to Defendant Mott based almost entirely on the Court's existing findings in its April 4, 2024 Decision and Order appointing a receiver. ECF No. 36.  As set forth below, Plaintiff indisputably seeks an award of money damages; is certainly likely to succeed on the merits of its claims; and has demonstrated that Defendants have already disposed of assets in an effort to frustrate the enforcement of a potential judgment obtained by FSB.  Moreover, the amount of damages sought by FSB—nearly $20 million—far exceeds any counterclaim that could possibly be asserted by Defendants. Thus, Plaintiff has met its burden and respectfully submits that attachment of the assets of each of the defendants in this litigation is necessary to ensure that any judgment awarded

8

in favor of Plaintiff is not worthless—an eventuality that becomes increasingly more likely as each day passes without the return of any of these wrongfully-obtained funds and the continued emergence of the Defendants' numerous creditors.[5]

Indeed, as stated in the Receiver's Monthly Activity Report dated June 4, 2024, the Entity Defendants had not paid payroll taxes since March 2024 (ECF No. 61 at ¶ 11); had not paid sales tax since February 2024 (*Id.*); and had not generated sufficient cash flow to meet current obligations (*Id.* at ¶ 24). Moreover, virtually all vendors were requiring payment prior to delivery (*Id.* at ¶ 10) and the Receiver's job consisted of "daily financial triage" due to cash management issues and shortfalls (*Id.* at ¶ 10).

## A. Plaintiff's Claims are For Money Damages

Plaintiff seeks money damages, and ultimately a money judgment, against each of the defendants in this action.  For example, Count I is a claim for fraud as against Mott, Harris, and the Entity Defendants (ECF No. 51 at ¶ 113).  Plaintiff, through Count I seeks a judgment for Plaintiff "in the amount of $18,979,005.79" plus interest and costs of collection.  Likewise Count X asserts a claim for Money Had and Received as against the Asset Holder Defendants and seeks a judgment against them, jointly and severally, for $18,979,005.79.  (ECF No. 51 at ¶ 187). Moreover, the Court, in its April 4, 2024 decision, expressly held that, as to Mott and the Entity Defendants, "Plaintiff seeks money damages . . ." (ECF No. 36 at 14).  Plainly, the first element for an order of attachment is satisfied.

---

[5] *See* Monthly Activity Report of Mark R. Kercher, CPA, Receiver (ECF No. 61); *see also* Kevin Oklobzija, "Receiver: Mott venues in 'precarious' position; contractor files lien foreclosure notice," ROCHESTER BUSINESS JOURNAL, June 12, 2024 (available at: https://rbj.net/2024/06/12/receiver-mott-venues-in-precarious-position-contractor-files-lien-foreclosure-notice/ (noting that among other difficulties, a contractor filed a lien of foreclosure on property owned by 11 Wexford Glen, LLC for nonpayment of $541,852.11 due and owing).

**B. <u>Plaintiff is Likely to Succeed on the Merits</u>**

Demonstrating a probability of success on the merits in this context requires Plaintiff to demonstrate that "it is more likely than not that it will succeed on its claims." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009).  In assessing whether a plaintiff can show a probability of success on the merits, "the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts." *Monteleone v. Leverage Group*, 2008 U.S. Dist. LEXIS 78983, 2008 WL 4541124, at *6 (E.D.N.Y. Oct. 7, 2008).

1. <u>Defendant Mott and the Entity Defendants</u>

First, Plaintiff is highly likely to succeed on the merits of its claims against Mott and the Entity Defendants.  For example, Plaintiff will prevail on its claim of common law fraud against Defendant Mott and the Entity Defendants through which Mott acted.  To plead fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) defendant's knowledge of the falsity of the statement; (3) intent to defraud; (4) reasonable reliance by the plaintiff; and (5) damage to the plaintiff. *See Crigger v. Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir. 2006).  Plaintiff must also state facts "sufficient to give rise to a strong inference of fraudulent intent."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,* 797 F.3d 160, 176 (2d Cir 2015).

As the Court found in its April 4, 2024 Order and Decision, Plaintiffs have adequately alleged each of these elements sufficiently to satisfy the heightened pleading standard of Rule 9(b).  First, "[t]he misrepresentation was in the form of the 21 checks that were written for amounts that allegedly did not exist from an account that was closed."  (ECF No. 36 at 15).  The second element is satisfied because Defendants' knew of the falsity of their statement, in particularly by "alleging that Mott had notice that the Kinecta II account was closed."  *Id.*  Third, Plaintiff has more than

sufficiently demonstrated Mott (and the Entity Defendants, through Mott) acted with intent to defraud because Plaintiff has alleged (and submitted undisputed evidence showing) that Mott repeatedly attempted "to write and deposit checks from the same closed account even after her first two attempts were charged back." *Id.*

Fourth, as the Court held, Plaintiff adequately demonstrated its reasonable reliance on these misrepresentations "because of the 'Funds Availability Policy,' an FSB policy that honored checks deposited into business bank accounts on the same day to facilitate smooth operations for the bank's business clients." *Id.* at 15-16.  In other words, Plaintiff relied on the representations that these checks were written from an open account supported by sufficient assets and acted in reliance on these misrepresentations when crediting the accounts based on invalid checks written from a closed account.  Fifth, because Mott substantially overdrew her accounts and they remain overdrawn by some $18,979,005.79—funds belonging to the Bank—Plaintiff has clearly been damaged by its reliance on the representations that the checks were valid and supported by sufficient funds.  Finally, as the Court noted, the "repeated attempts to deposit checks from a closed account are sufficient to raise a strong inference of scienter," since a reasonable person would have attempted to verify the account status or they were written from the correct account rather than repeatedly writing checks from a closed account.  *Id.* at 16.

For similar reasons, Plaintiff will prevail on, *inter alia*, its claim under RICO as to Mott, Harris and the Entity Defendants.  As alleged in substantial detail, Mott, and the Entity Defendants engaged in multiple wrongful acts forming a "pattern" of racketeering conduct, utilizing ostensibly legitimate businesses owned or controlled by Mott to perpetrate their fraudulent criminal enterprise.  As this Court noted previously, Plaintiff has more than adequately alleged each of the elements for its RICO claims (ECF 36 at 7) by demonstrating that Mott and the Entity Defendants

repeatedly passed checks in massive quantities and values with funds insufficient to fund nearly any of them, then acted to withdraw the non-existent funds (to which Mott had access, despite said checks being uncleared and uncollected).  *Id.* at 7-8.  Because Mott and the Entity Defendants took millions in funds from FSB without any claim of right and the retention of said funds would be unjust, Plaintiff will also prevail on its claim for unjust enrichment.

        2.   <u>The Asset Holder Defendants</u>

    Plaintiff is also likely to succeed on the merits of its claims against the individual Defendants Harris, Bourne, Pagano and LaRocca, as set forth below.

        i.    Conspiracy to Violate RICO

To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d), a "plaintiff must prove (1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner (although not necessarily by the commission of any RICO predicate acts himself)." *City of New York v. Chavez*, 944 F. Supp. 2d 260, 268-69 (S.D.N.Y. 2013) citing *Valenti,* 850 F.Supp.2d at 450-51.

    It is not necessary to find that each defendant knew all the details or the full extent of the conspiracy, including the identity and role of every other conspirator. *United States v. Boylan*, 898 F.2d 230, 242 (1st Cir. 1990) ("A RICO conspiracy does not demand . . . that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with all other defendants."). All that is necessary is to prove that he or she agreed with one or more co-conspirators to participate in the conspiracy. "It is not necessary for the conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the

interdependence of activities and persons involved." *Chubb & Son Inc. v. Kelleher*, 2010 U.S. Dist. LEXIS 141842 (E.D.N.Y. Oct. 22, 2010) (citing *United States v. Concemi*, 957 F.2d 942, 950 (1st Cir. 1992)), report and recommendation adopted, 2011 U.S. Dist. LEXIS 22834, 2011 WL 839553 (E.D.N.Y. Mar. 7, 2011). The defendant's agreement may be inferred from circumstantial evidence of his status in the enterprise and his knowledge of the wrongdoing. *United States v. Teitler*, 802 F.2d 606, 614 (2d Cir. 1986)).

Here, the Asset Holder Defendants repeatedly accepted and deposited vast sums of money over a relatively short period of time that they knew were not the property of Mott or the Entity Defendants.  By "fronting" purported "business expenses" for Mott her businesses and thereafter accepting kited funds as "reimbursement," the Asset Holder Defendants knowingly joined and furthered the corrupt enterprise.

ii.     Aiding & Abetting Fraud

To succeed on a claim for aiding and abetting fraud, a plaintiff must prove: (1) that an independent wrong exists; (2) that the aider or abettor knows of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong. *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 312 (S.D.N.Y. 2009).

As this Court noted in its Decision and Order (ECF No. 36), Plaintiff "has substantiated its claims with specific allegations and documentation of the essential events constituting the core of its claims—the fraudulent financial transactions[…]." ECF No. 36 at 9.  Moreover, given the relationship each Asset Holder Defendant had with Mott and the respective Entity Defendant(s) with which they were affiliated, the Court can infer that the Asset Holder Defendants had actual knowledge that the funds being extracted from the Bank could not have been business revenue or other credibly-sourced assets.  Each of the Asset Holder Defendants affirmatively furthered the

13

criminal enterprise and fraudulent scheme by facilitating the withdrawal and dissipation of millions of dollars, which allowed Mott to use stolen funds cover her supposed business expenses.

iii.     Money Had and Received

To prove a claim for a claim of money had and received, the plaintiff must show that: "(1) the defendant received money belonging to the plaintiff, (2) the defendant benefited from the receipt of the money, and (3) under principles of equity and good conscience, the defendant should not be permitted to keep the money." *U.S. SBA As Receiver of Elk Assocs. Funding Corp. v. Ameritrans Holding, LLC*, 2024 U.S. Dist. LEXIS 29702, *8 (E.D.N.Y. Feb. 21, 2024). Plaintiff is also likely to succeed on the merits of this claim. Almost as soon as Defendant Mott opened the first Entity Account, she began engaging in a pattern of writing and depositing multiple large (and unsupported) checks from multiple accounts with the Bank and other institutions in order to create the impression of large account balances during the check clearing process. (ECF 51 at ¶ 29). In order to reap the rewards of this scheme, Mott and the Entity Defendants used the Asset Holder Defendants as conduits to realize and safeguard these ill-gotten gains. Specifically Mott and the Entity Defendants obtained hundreds of cashier's and counter checks written against the fraudulently-inflated account balances (in both the Entity Accounts and Mott's personal accounts) and payable to the Asset Holder Defendants that totaled at least $7,507,403.92 (the "Asset Holder Funds"). (ECF No. 51 at ¶¶87-103).

Each of these checks, numbering over 400 in total, were deposited by the relevant Asset Holder Defendant into an account over which they exercised at least partial control. *See* ECF No. 51-3, 51-4, 51-5, and 51-6.[6] The overwhelming majority of these Asset Holder Funds were, in

---

[6] In total, Bourne received and deposited over $3.7 million in checks from Mott and the Entity Defendants, while Pagano, an event coordinator and restaurant manager, received and deposited over $1.79 million in the same timeframe. (ECF No. 51 at ¶¶ 97, 98). Larocca, the former chef,

fact, wrongfully obtained directly through Defendant Mott and the Entity Defendants' long-term check-kiting scheme. In one particularly clear example, Defendant Pagano received and deposited a check for $14,000.00 on February 23, 2024 from KRM Events LLC—the very day on which Mott's scheme began to unravel. *See* ECF No. 36 at 3-4 (detailing events of February 22, 2024-February 23, 2024, including the negative account balances arising from dishonored checks written in connection with the Corrupt Enterprise).

The fact that the Asset Holder Defendants received money belonging to Plaintiff is demonstrated on the face of the Entity Account bank statements. *See* Ellis Aff., Exhibits A-F. For example, in August 2023, Defendant Mott and Entity Defendant KRM Events issued some $811,854.57 in checks to the Asset Holder Defendants from the account ending -0529. *See* Ellis Aff., Ex. E[7]; *see also* ECF No. 51-3, 51-4, 51-5, and 51-6. During August 2023, that account had an average "ledger" balance of $34,455.93 and average collected balance of -$1,430,670.47.[8] *See* Ellis Aff., Ex. E. In other words, during August 2023, this account had, on average, only $34,455.93 in collected, cleared funds available and, on average, the account was funded by

---

received and deposited over $428,000 from Mott and the Entity Defendants in the space of 10 months. Harris—who does not appear to have a formal role with any of the Entity Defendants—received some $1,543,197.81 between December 2022 and November 2023.

[7] The Exhibits A through F attached to the Affidavit of Lois Ellis sworn to on August 2, 2024 are copies of selected account statements for several of the accounts held in the name of the Defendant Entities. These account statements are for illustrative example only, as a full forensic review and accounting of the Defendant Entities' account activity is ongoing.

[8] The "average collected balance" refers, generally, to the monthly average ledger balance for an account (funds actually available within an account, i.e. funds that have been "collected")," for one month, minus the average daily float balance (i.e. the daily average balance of "uncollected" funds for which a transaction or check is still processing). Access to this uncollected balance is an essential ingredient for check-kiting; in short, the "kiter" is writing checks against this uncollected balance—as Mott did based on the Availability of Funds policy. *See, e.g.,* "Check-Kiting, Funds Availability, Wire Transfer Activity," OFFICE OF THE COMPTROLLER OF THE CURRENCY, Advisory Letter AL-96-6.

15

$1,430,670.47 in uncleared, uncollected, and ultimately fraudulent checks that Defendant Mott continuously deposited to continue maintaining the artificially-inflated balance.  In light of the fact Defendant Mott issued $1,025,055.04 in payments from that account during August 2023, it is plainly apparent that the Asset Holder Defendants received money rightfully belonging to Plaintiff.

Finally, equity and good conscience requires the return of the Asset Holder Funds to the Bank.  A claim for money had and received "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 86 (2d Cir. 2021).  As alleged in the Amended Complaint, the Asset Holder Defendants have refused to identify any valid business purpose for any of the hundreds of checks from Defendant Mott and the Defendant Entities that they deposited into bank accounts they control.  (ECF No. 51 at ¶ 102).  The explanation the Asset Holder Defendants proffer for accepting and depositing the kited funds, *i.e.,* that they were reimbursements for legitimate business expenses, is misguided. It requires the Court to accept the Defendants' implausible version of events that Mott borrowed more than $7.5 million from the Asset Holder Defendants over 14 months for lawful business expenses. Simply put, the Court cannot accept the Asset Holder Defendants' far-fetched and self-serving explanation at face value, before any discovery has been conducted.

If permitted to retain the Asset Holder Funds, the Asset Holder Defendants would "be enriching [themselves] unjustly at the expense of another," since they provided nothing in exchange for the millions of dollars they received. Equity and good conscience cannot permit the Asset Holder Defendants to continue to retain the benefit of possessing, controlling, or using at least some portion of the $7.5 million in Asset Holder Funds wrongfully obtained through an outright fraud for no consideration whatsoever.

**C.  Attachment is Proper Based on Defendants' Fraudulent Conduct**

Plaintiff satisfies the third element for attachment because the grounds under CPLR 6201(3), fraudulent disposition of assets, are established here.  As discussed above, each of the Defendants has, in fact, already participated in the disposition or concealment of some portion of more than $18.9 million wrongfully obtained from the Bank in connection with the Corrupt Enterprise.  To date, more than $18.9 million that Defendants fraudulently obtained from Plaintiff remains unaccounted for, including the over $7.5 million in Bank funds that Mott transferred to the Asset Holder Defendants.  By using the Asset Holder Defendants as conduits for withdrawal and secretion or dissipation of the proceeds of the Corrupt Enterprise, the Defendants ensured that Plaintiff would not be able to locate or recover these ill-gotten gains.  Indeed, Plaintiff has offered evidence of actual transfers or dispositions of assets were clearly intended to frustrate Plaintiff's ability to claw back those funds back and make a judgment in favor of Plaintiff unenforceable.  Certainly, no explanation to the contrary has been furnished.

Moreover, the remedy of attachment is necessary for security purposes here based on, *inter alia*, the Defendants' demonstrated track record of fraudulently concealing or dissipating substantial funds belonging to the Bank and Defendant Mott's track record of misleading the Bank that she would (and could) promptly repay the Bank.  (*See* ECF No. 51 at ¶¶ 55-56).  An overwhelming number, if not all, of the transactions and transfers involving the Asset Holder Defendants were executed with the fraudulent intent of frustrating any effort by the Bank to recoup funds wrongfully credited to the Entity Accounts and Mott's accounts or collect on a judgment entitling it those funds.  Fraudulent intent is generally proven "circumstantially by proof of certain 'objective facts' – 'badges of fraud' – that give rise to an inference of intent to defraud." *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374-75 (S.D.N.Y. 2003).

17

Here, numerous badges of fraud are present.  First, there was a "gross inadequacy of consideration," because the transfers were made using non-existent funds credited from fraudulent checks.  *Id.*  Second, each of the transfers were between closely-related parties.  *Id.*  Defendant Mott controlled each of the Defendant Entities, employed three of the Asset Holder Defendants, and is married to the remaining Asset Holder Defendant, Defendant Harris. (ECF No. 51).  Third, there is simply no legitimate business reason for check-kiting, which is *per se* fraudulent, meaning the at-issue transactions cannot have occurred in the normal course of business.  *See Bank of Am., N.A. v. Fischer*, 927 F. Supp. 2d 15, 30, n. 8 (E.D.N.Y. 2013) (the "act of check kiting is an exemplar of bank fraud.")  Fourth, Plaintiff has alleged—without rebuttal—that Defendant Mott and the Asset Holder Defendants continue to exercise control over some portion of the proceeds of the Corrupt Enterprise. (ECF No. 51 at ¶¶ 93-95).  Finally, both the chronology of the transactions—including the repeated presentation of fraudulent checks from a closed account days apart—and the unusualness of these overlapping, six-figure transactions culminating in an overdraft of more than $20 million both further support a finding of fraudulent intent.  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995); *see also Societe Generale v. Flemingdon Dev. Corp.*, 118 A.D.2d 768, 7773 (2d. Dep't 1986) (knowingly presenting and re-presenting a check backed by insufficient funds demonstrates "intent to secrete [] assets to frustrate [] collection on the check.").  Plaintiff has accordingly more than satisfied the third requirement for an order of attachment to issue.

### D.  <u>Plaintiff's Demand Exceeds All Known Counterclaims</u>

Finally, it is undisputed here that the amount demanded by FSB exceeds all known counterclaims. "*Bank Leumi Trust Co. v. Istim, Inc.*, 892 F. Supp. 478, 482 (S.D.N.Y. 1995).  The damages demanded by Plaintiff, no less than $56.9 million (treble its minimum damages of $18.9

million), far exceeds the value of all known counterclaims against Plaintiff. *See* CPLR 6212(a). To date, no counterclaim has been filed against Plaintiff, and Plaintiff has no basis to believe it will be the defendant to a counterclaim at this time. Moreover, even should any counterclaim be filed by any of the Defendants, Plaintiff would vigorously contest such counterclaims and would not concede that they are just, meaning this requirement will remain satisfied. *See City of New York v. CitiSource, Inc.*, 679 F. Supp. 393, 399 (S.D.N.Y. 1988) (for purposes of CPLR 6212, the fourth element, the value of all counterclaims has been interpreted to mean the value of "any counterclaims *that plaintiff concedes as just.*") (emphasis added).

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff Five Star Bank respectfully submits that it has satisfied its burden under Fed. R. Civ. P. 64, CPLR 6212, and 6201. Plaintiff therefore respectfully requests that this Court enter an Order attaching the assets of each of the Defendants to this action and awarding such other and further relief that this Court may deem just and equitable.

Respectfully submitted,

**BARCLAY DAMON LLP**

by: */s/ David G. Burch, Jr.*

David G. Burch, Jr.
Sarah A. O'Brien
Benjamin R. Zakarin
One HSBC Plaza, 2000
100 Chestnut Street
Rochester, New York 14604
Telephone (315) 425-2716
dburch@barclaydamon.com
sobrien@barclaydamon.com
bzakarin@barclaydamon.com
*Attorneys for Plaintiff Five Star Bank*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that, on August 12, 2024, I served the foregoing document on all counsel of record via the Court's ECF system.

*/s/ David G. Burch, Jr.*
**David G. Burch, Jr.**
