UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FIVE STAR BANK,

—vs—

KATHERINE MOTT, *et al*

*Defendants.*

24-CV-06153-FPG

ROBERT HARRIS'S REPLY
MEMORANDUM OF LAW

INTRODUCTION

Plaintiff concedes, as it must, that there are only three allegations of fact concerning Harris's conduct upon which the Court can rely in determining whether the complaint establishes a "strong inference" that Harris was engaged in fraud or committed racketeering offenses. They are: (1) that he is married to Katherine Mott (ECF Doc. 92, pp. 2 and 5); (2) he is a "co-owner of the businesses" (ECF Doc. No. 92, p. 2)[1]; and (3) that he received about $1.5 million from Mott, or the Entity Defendants, or both between December 2022 and February 2024 (ECF Doc. No. 92, p. 5). Every other allegation about what Harris did, said, saw, heard, or knew is a conclusory, boilerplate recitation of elements of the various causes of action against him based upon information and belief.

These conclusory, boilerplate allegations are insufficient to state a claim against Harris under Rule 12 (b) (6)—especially in a case where each of the causes

---

[1] This statement is inconsistent plaintiff's amended complaint, which claims (upon information and belief) that Harris: "managed, operated, and/or controlled" two of the ten so-called Entity Defendants [KRM Events, LLC] and 11 Wexford Glen, LLC (ECF Doc. No. 51, ¶ 8 and 12); and that he opened one Five Star Bank business banking account with Mott in November 2022 (for KRM Events, LLC) (ECF Doc. No. 51, ¶ 28 [a], fn. 1).

of action against Harris are subject to the heightened particularity requirements of Rule 9 (b) because they are premised on allegations of fraud.  We attempted to address the legal principles pertinent to this case in our initial memorandum of law as thoroughly and comprehensively as we could (ECF Doc. No. 75-2).  We do not intend to spend a lot of time replying to each argument in plaintiff's opposition to Harris motion because our initial motion papers sufficiently refute plaintiff's response.  Instead, we will address three aspects of plaintiff's opposition papers, which we think vividly illustrate that plaintiff's attempt to overcome Harris motion to dismiss is futile.

## 'WHO, WHAT, WHEN, WHERE, AND HOW'

First, in response to Harris's challenge to plaintiff to identify the 'who, what, when, where, and how' facts to support a "strong inference" that Harris engaged in fraud and RICO offenses as alleged, plaintiff appears to assert that the answers to these questions are found in (or on) the cashier's checks attached to its amended complaint.  According to plaintiff, these checks show "***who*** the check was written by; to ***whom*** the check was issued to; ***what*** the dollar amount of the check was; ***where*** the check was issued from[2]; as well as the check, routing, and account numbers" (ECF Doc. No. 92, pp. 2-3) (emphasis in the original).

We agree that these could be characterized as hard facts, so to speak.

The problem for the plaintiff is that these 'who, what, when, where, and how' facts do not relate to <u>Harris</u> or <u>his conduct</u>—they relate to the plaintiff's own

---

[2] Which is essentially (if not actually) the same as "who the check was written by".

cashier's checks. The plaintiff's cashier's checks are not defendants in this case. Pointing out specific information on these cashier's checks is not a substitute for specific allegations of conduct by Harris, including what he did, when he did it, where he did it, and how he did it. And as we have set forth in our initial memorandum of law, this is especially so in a case where the plaintiff is publicly accusing Harris of being a fraudster and racketeer. Plaintiff's reliance on information on the face of its own cashier's check as being particularized allegations of conduct in support of its complaint against Harris is, in our view, tantamount to a concession by plaintiff that its complaint is legally insufficient.

F<small>IVE</small> S<small>TAR</small> B<small>ANK</small>'<small>S</small> C<small>ASHIER</small>'<small>S</small> C<small>HECKS AND A</small> P<small>RESUMPTION OF</small> L<small>EGITIMACY</small>

Second, conspicuous by it absence in plaintiff's opposition papers is a response to Harris's argument that the fact that every check plaintiff claims to have been issued to Harris (or the other "Asset Holder Defendants") and allegedly deposited into his personal bank account was a <u>cashier's check issued by the plaintiff itself</u>, and that this fact provided Harris with assurance that the check was legitimate and that there were sufficient funds available on deposit from the account from which the funds were drawn (ECF Doc. No. 75-2, pp. 14-15).

Stated another way—and contrary to plaintiff's contention—from Harris's perspective, the fact that the checks payable to him are cashier's checks drawn against Five Star Bank itself and issued under the signature of Five Star Bank's Chief Executive Officer, supports a reasonable inference that these checks were <u>not</u> part of an improper, illegal, or fraudulent scheme, but rather were legitimate negotiable instruments related to legitimate banking transactions.

> A cashier's check [] is a check drawn by the bank upon itself, payable to another person, and issued by an authorized officer of the bank. The bank, therefore, becomes both the drawer and drawee; and the check becomes a promise by the bank to draw the amount of the check from its own resources and to pay the check upon demand. Thus, the issuance of the cashier's check constitutes an acceptance by the issuing bank; and the cashier's check becomes the primary obligation of the bank … Since a cashier's check is a bank's primary obligation, a cashier's check is presumed to have been issued for value. This presumption cannot be overcome by evidence that the bank did not receive consideration for the cashier's check from the payee. Such proof is irrelevant and provides no defense … Hence, once the cashier's check has been issued and delivered to the payee, the transaction is complete so far as the payee is concerned. Any failure of the bank to charge such checks against the account of the depositor or to take other action to protect its own rights and interests will not affect the unconditional right of payment inuring to the payee …

*Kaufman v. Chase Manhattan Bank, Natl. Asso.*, 370 F. Supp. 276, 278 [SDNY 1973]) (internal citation omitted); See also, *Bouzo v Citibank, N.A.*, 96 F.3d 51, 58 [2d Cir 1996]) ("A 'bank pay order' might simply be a cashier's check, a common form of negotiable instrument in which a bank draws upon itself" [citing *Kaufman v. Chase Manhattan Bank, supra*]).

So, not only are the 'what, when, where' of the cashier's checks attached to the amended complaint insufficient to constitute particularized facts necessary to state valid causes of action against Harris for fraud and racketeering offenses (see above), but these cashier's checks support the opposite conclusion—that they were legitimate instruments drawn for legitimate purposes.

INFORMATION "PECULIARLY WITHIN THE OPPOSING PARTY'S KNOWLEDGE"

In an apparent attempt to convince the Court to excuse its failure to allege sufficient facts to support its causes of action against Harris (and other defendants), plaintiff argues that its pleading deficiencies should be forgiven based on its claims

that the facts it needs to plead valid claims are peculiarly within Harris's knowledge.

It is true that the "[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge" (*Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 [2d Cir. 1990]) (citations omitted).  But in making this argument, the plaintiff ignores the second and equally important part of this principle of law, which is that "[t]his exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce <u>specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard</u> (*Id.*) (citations omitted) (underlying added for emphasis).

The two principal cases upon which the plaintiff relies in support of its argument here are easily distinguishable from our case.

In *Allied Ir. Banks, P.L.C. v Bank of Am., N.A.*, 2006 U.S. Dist. LEXIS 4270 [S.D.N.Y. Jan. 31, 2006]), we counted fifteen factual allegations reference by the court of specific misrepresentations, material omissions, and other misconduct against the defendants Bank of America and Citibank that could support a "strong inference" that these defendants engaged in fraud.  They are: (1) substituting "daily trade recaps" for more detailed daily trade confirmations; (2) omitting information on transfer activity and on profits and losses; (3) discontinuing the transmission of brokerage account statements to plaintiff's subsidiary; (4) hiding the existence and

- 5 -

availability of defendants prime brokerage websites to plaintiff's subsidiary; (5) failing to mention the brokerage websites to plaintiff's subsidiary; (6) disregarding industry standards by agreeing not to confirm all trades; (7) suppressing phone confirmations for foreign transactions; (8) eliminating verbal confirmation on a certain account related to trades; (9) withholding information on market-to-market trades; (10) deferring plaintiff's subsidiary's monthly settlement payments without authorization; (11) lending $200 million to the principal fraudster[3] to cover-up $200 million in losses to plaintiff's account; (12) creating fake "forward trades" and "option trades" to further conceal their fraudulent conduct and related losses; (13) sending false confirmations of these fake trades to create the illusion that trades were being made; (14) engaging with their co-defendant in "same-day-options" to "camouflage" losses caused by the fraudulent scheme; and (15) deviating from their own written policies—and industry custom—to engage in unauthorized off-market transactions (*Id.* 5-11).  Given these allegations, it is not surprising that the defendant's motion to dismiss under Rule 12 (b) (6)  and Rule 9 (b) was denied.

The case that constitutes the centerpiece of plaintiff's argument on this issue, *Amalgamated Nat'l. Health Fund v. Hickey Freeman Tailored Clothing, Inc.*, 2024 U.S. Dist. LEXIS 56439 [S.D.N.Y. Mar. 28, 2024, No. 1:23-cv-1428-GHW]) is not only unhelpful to the plaintiff, but in our view, detrimental to its position.  There are at least three reasons for this conclusion.

---

[3] One John Rusnak, who pleaded guilty to bank fraud and was sentenced to seven-and-a-half years in prison for his part in this fraudulent scheme.

First, and perhaps in order to understand our analysis, we think it is important to be clear that there are only two named defendants in *Amalgamated Nat'l Health Fund*: (1) Hickey Freeman Tailored Clothing, Inc.; and (2) its principal owner and CEO, Stephen Granovsky.

Second, in the context of the *Amalgamated Nat'l Health Fund* case, the dispute about whether certain facts are "peculiarly within the opposing party's knowledge" is exceedingly narrow. Specifically, it is about whether <u>a non-party</u> (Hickey Freeman's CFO, Alan Peck) was acting as Granovsky's agent when Peck made allegedly fraudulent statements to the plaintiff (*Id.* at 4).

Third, a review of the complaint in *Amalgamated Nat'l Health Fund* makes it clear that—Alan Peck's involvement or status as Granovsky's agent notwithstanding—there are numerous particularized allegations of fact concerning Granovsky's own conduct to support the conclusion that the plaintiff stated valid causes of action against Granovsky. We counted twenty-one. They are, as follows: (1) during a specified period, plaintiff negotiated an agreement with <u>Granovsky</u> concerning payment of Hickey Freeman's delinquent payment obligations to the health and welfare fund administered by plaintiff [ECF Doc. No. 28, ¶ 28][4]; (2) <u>Granovsky</u> refused to sign the settlement agreement he negotiated for payment of delinquent benefit contributions [ECF Doc. No. 28, ¶ 29]; (3) <u>Granovsky</u> routinely requested more time to pay delinquent benefit payments, upon which plaintiff relied, but no payments were ever made [ECF Doc. No. 28, ¶ 40]; (4) <u>Granovsky</u> told plaintiff's representative that he was in the process of selling a building and would

---

[4] References in this paragraph refer to S.D.N.Y. Case No. 1:23-cv-1428-GHW

- 7 -

use the proceeds to make payment toward Hickey Freeman's delinquency [ECF Doc. No. 28, ¶ 48]; (5) Granovsky was awarded $70 million from New York State to convert one of it buildings, yet failed to make payments toward Hickey Freeman's delinquency [ECF Doc. No. 28, ¶ 49]; (6) Granovsky made numerous promises to plaintiff that Hickey Freeman would pay its delinquencies and plaintiff relied on these promises to continue to provide health and welfare coverage to Hickey Freeman employees [ECF Doc. No. 28, ¶ 50]; (7) on a specific date, plaintiff advised Granovsky that it would terminate health and welfare coverage if Hickey Freeman did not pay its delinquent health fund contribution [ECF Doc. No. 28, ¶ 52]; (8) Granovsky falsely promised to pay the delinquencies in full [ECF Doc. No. 28, ¶ 52]; (9) plaintiff again relied on Granovsky's promises to continue to provide health and welfare coverage to Hickey Freeman employees [ECF Doc. No. 28, ¶ 52]; (10) during specified periods of time, plaintiff negotiated a second settlement agreement with Granovsky, including a confession of judgment, for full payment of Hickey Freeman's delinquent health fund contributions [ECF Doc. No. 28, ¶ 53]; (11) Granovsky refused to execute the second agreement, despite his promises that he would do so [ECF Doc. No. 28, ¶ 53]; (12) Granovsky never intended to pay the delinquency despite his promises to do so [ECF Doc. No. 28, ¶ 54]; (13) Granovsky's promises to make payment on the delinquency were false and intended to stop plaintiff from terminating health and welfare coverage for Hickey Freeman employees [ECF Doc. No. 28, ¶ 55]; (14) on a specific date, plaintiff notified Granovsky that it was terminating Hickey Freeman's health and welfare coverage because of Granovsky's persistent failure to pay the delinquency due [ECF Doc. No. 28, ¶ 57]; (15) on a specific date, Granovsky sent a settlement proposal to plaintiff,

to which plaintiff refused to agree because of Granovsky's repeated false representations in the past concerning promises to pay the delinquency owed to plaintiff [ECF Doc. No. 28, ¶ 59-60]; (16) <u>Granovsky</u> had full operational control of Hickey Freeman and made executive decisions on behalf of the company [ECF Doc. No. 28, ¶ 63]; (17) <u>Granovsky</u> decided when and how much Hickey Freeman would contribute to the health and welfare fund administered by plaintiff [ECF Doc. No. 28, ¶ 64]; (18) <u>Granovsky</u> executed agreements on behalf of Hickey Freeman concerning the company's delinquency to the health fund administered by plaintiff [ECF Doc. No. 28, ¶ 65]; (19) "<u>Granovsky personally</u>", and through Alan Peck, negotiated with plaintiff concerning payment of Hickey Freeman's delinquency to the plaintiff [ECF Doc. No. 28, ¶ 66] [underlining added for emphasis]; (20) "<u>Granovsky personally</u>", and through Alan Peck, made serial promises, which he never intended to keep [ECF Doc. No. 28, ¶ 67] [underlining added for emphasis]; and (21) "<u>Granovsky</u> and, upon information and belief, Mr. Peck <u>at Mr. Granovsky's direction … repeatedly falsely represented …</u>" that Hickey Freeman would pay the delinquency owed to plaintiff [ECF Doc. No. 28, ¶ 85] [underlining added for emphasis].  These do not include three paragraphs in which the plaintiff in *Amalgamated Nat'l Health Fund* alleges communication with Granovsky "and/or" Peck (ECF Doc. No. 28, ¶¶ 37, 38, and 39).

Under these circumstances, we do not see how the issue in the *Amalgamated Nat'l Health Fund* case presents "precisely the situation" we have in our case, as plaintiff claims on page 11 of its memorandum in opposition (ECF Doc. No. 92, p. 11).  Whatever is going on in *Amalgamated Nat'l Health Fund*, it does nothing to

change the fact that the plaintiff in our case has failed to allege sufficient facts to establish a "strong inference" that Harris was engaged in fraud, or that he was engaged in conduct constituting a RICO violation.

### REQUEST TO JOIN IN CO-DEFENDANT'S ARGUMENTS

We have received and reviewed the reply memoranda of co-defendants Pagano (ECF Doc. No. 98), LaRocca (ECF Doc. No. 99), and Mott and the Entity Defendants (ECF Doc. No. 100). We respectfully request that the Court permit Harris to join in and incorporate the legal arguments made therein into this reply memorandum to the extent they are consistent with Harris's position herein.

### CONCLUSION

Wherefore, defendant Robert Harris respectfully requests that the Court dismiss the amended complaint against him, and that the Court grant such other relief as may be just and proper.

DATED: September 2, 2024

*s/Matthew R. Lembke*

Matthew R. Lembke
CERULLI MASSARE & LEMBKE
*Attorney for Robert Harris*
45 Exchange Blvd., Suite 925
Rochester, NY 14614
Telephone: [585] 454-3323
matt.lembke@cmllawfirm.com